## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MSP RECOVERY CLAIMS, SERIES LLC, a Delaware series limited liability company; MSP Recovery Claims PROV, Series LLC, a Delaware series limited liability company; MSPA CLAIMS I, LLC, a Florida limited liability company; MAO-MSO RECOVERY II, LLC, Series PMPI, a segregated series of MAO-MSO RECOVERY II, LLC, a Delaware series limited liability company; and MSP RECOVERY CLAIMS SERIES 44, LLC, on behalf of themselves and all others similarly situated,

       Plaintiffs,

          v.

PFIZER, INC.; ADVANCED CARE SCRIPTS; and PATIENT ACCESS NETWORK FOUNDATION,

       Defendants.

_____/

**CLASS ACTION**

**JURY TRIAL REQUESTED**

## **COMPLAINT**

1

## TABLE OF CONTENTS

I.      NATURE OF ACTION ................................................................................................. 3

II.     PARTIES, JURISDICTION, AND VENUE .................................................................. 6

III.    STANDING ................................................................................................................ 13

IV.     REGULATORY BACKGROUND .............................................................................. 14

V.      FACTUAL ALLEGATIONS ...................................................................................... 16

VI.     OIG GUIDANCE FOR CO-PAYMENT CHARITIES................................................. 20

VII.    THE CO-PAYMENT CIRCUMVENTION ENTERPRISE PERMITTED PFIZER TO
        CHARGE SUPRA-COMPETITIVE PRICES FOR AND ARTIFICIALLY INFLATE
        THE QUANTITY OF SUBJECT PFIZER DRUGS DISPENSED................................. 22

VIII.   OIG ADVISORY OPINIONS TO PANF...................................................................... 34

IX.     THE IMPACT ON PLAINTIFFS AND THE CLASS MEMBERS ............................... 35

X.      CLASS ACTION ALLEGATIONS ............................................................................ 40

XI.     TOLLING OF THE STATUTE OF LIMITATIONS...................................................... 43

XII.    CLAIMS FOR RELIEF .............................................................................................. 44

        FIRST CLAIM FOR RELIEF ..................................................................................... 44

        SECOND CLAIM FOR RELIEF ............................................................................... 51

        THIRD CLAIM FOR RELIEF .................................................................................... 55

        FOURTH CLAIM FOR RELIEF ................................................................................ 69

        FIFTH CLAIM FOR RELIEF ..................................................................................... 72

**DEMAND FOR JUDGMENT** ................................................................................ **76**

**JURY DEMAND**................................................................................................... **77**

**APPENDIX**.......................................................................................................... **80**

Plaintiffs, MSP Recovery Claims, Series LLC ("MSPRC"); MSPA Claims 1, LLC ("MSPA"); MAO-MSO RECOVERY II, LLC, Series PMPI, a segregated series of MAO-MSO Recovery II, LLC ("MAO-MSO"); MSP Recovery Claims Series 44, LLC ("Series 44"); and MSP Recovery Claims PROV, Series LLC ("Claims PROV" and collectively, "Plaintiffs"), on behalf of themselves, the putative class members consisting of Medicare Advantage health plans[1] and Medicaid health plans[2] (collectively, "Class Members"),[3] bring this action against defendants Pfizer, Inc. ("Pfizer"); Advanced Care Scripts ("ACS"); and Patient Access Network Foundation ("PANF" and collectively, "Defendants"), and allege:

## I.   **NATURE OF ACTION**

1.     This case arises from Pfizer's conspiratorial scheme to increase the unit price and quantity dispensed of three Pfizer drugs, Sutent, and Inlyta, which both treat renal cell carcinoma, and Tikosyn, which treats arrhythmia in patients with atrial fibrillation or atrial flutter (collectively, "Subject Pfizer Drugs"). As a result of this scheme, Plaintiffs' assignors ("Assignors")[4] and the Class Members paid supra-competitive prices for artificially inflated quantities of dispensed Subject Pfizer Drugs on behalf of beneficiaries enrolled in their health plans ("Enrollees").

---

[1] "Medicare Advantage health plans" is defined as Medicare Advantage entities such as Medicare Advantage organizations ("MAO"), Independent Practice Associations ("IPA"), Management Service organizations ("MSO"), Health Maintenance organizations ("HMO"), and other Medicare first tier, downstream, and related entities. Throughout the Complaint, "MA Plans" is used as a shorthand for all such Medicare Advantage health plans.

[2] "Medicaid health plans" is defined as Medicaid managed care organizations ("MCO") and other Medicaid first tier, downstream, and related entities. Throughout the Complaint, "Medicaid Plans" is used as a shorthand for all such Medicaid health plans.

[3] The full class is defined below, Section X.

[4] Plaintiffs hold assigned rights through assignments from numerous entities including MAOs, MCOs, full-risk organizations such as MSOs, IPAs, and other Medicare and Medicaid first-tier, downstream, and related entities, all of which act as third-party payers, that provide, among other things, prescription drug benefits to their enrolled beneficiaries ("Enrollees").

2.      Defendants created a scheme to circumvent Congressionally mandated co-payment requirements (referred to as the "Co-Payment Circumvention Enterprise" or simply, the "Scheme") designed to reduce sensitivity to ever increasing drug prices and increased dispensing of the Subject Pfizer Drugs.[5]

3.      As part of this Scheme, ACS shared PANF data with Pfizer, to ensure that PANF did in fact use the purported "donations" to pay the co-pays for patients' prescriptions of Sutent and Inlyta. Pfizer, ACS, and PANF ensured that Medicare and Medicaid patients taking Sutent and Inlyta moved from Pfizer's free drug program to PANF. In doing so, Defendants increased the price of the Subject Pfizer Drugs by eliminating price sensitivity.

4.      As part of this Scheme, Pfizer conspired with PANF to create and finance a fund for Medicare patients being treated for arrhythmia with atrial fibrillation or atrial flutter. Pfizer coordinated the timing of the opening of the fund for the Medicare patients with a Tikosyn price increase, and referred all Medicare patients who needed financial assistance to meet their newly-increased copays for Tikosyn to PANF. Tikosyn patients accounted for virtually all of the beneficiaries of the fund.

5.      Defendants also funneled patients away from Pfizer's free drug program—which remained available to non-Medicare/Medicaid beneficiaries—by ensuring that the large sums of money Pfizer continuously paid to PANF improperly influenced PANF's practices.

---

[5] When Medicare beneficiaries, including those covered by MA Plans, obtain a prescription drug, the beneficiaries may be required to make a co-payment. Congress included co-payment requirements in the Medicare structure, in part, to encourage market forces to serve as a check on health care costs, specifically including the prices that pharmaceutical companies can demand for their drugs. Austin, Frerick A., *The Cloak of Social Responsibility: Pharmaceutical Corporate Charity*, TAX NOTES, Vol. 153, No. 9, Nov. 28, 2016 [hereinafter *Cloak of Social Responsibility*].

6.     In doing so, Defendants artificially increased the quantity of claims paid by the Assignors and Class Members for the Subject Pfizer Drugs. As a result, the Assignors and Class Members were forced to pay artificially increased prices for an increased quantity of the drugs.

7.     Defendants executed their Scheme, engaging in numerous overt acts that both effectively eliminated price sensitivity, allowing Pfizer to raise its prices to supra-competitive levels and causing the Subject Pfizer Drugs to be dispensed in artificially inflated quantities. This resulted in cognizable economic damages as the Assignors and Class Members paid substantially more than they otherwise would have—but for the Co-Payment Circumvention Enterprise.

8.     Pfizer, a sophisticated pharmaceutical manufacturer, knew that the intended victims of the Scheme were the health plans Plaintiffs seek to represent. Indeed, after a patient's cost sharing obligation is paid, health plans such as the Assignors and Class Members are essentially powerless and have no other choice but to pay for the Subject Pfizer Drugs.

9.     In May 2018, Pfizer paid $23.85 million to settle the United States' claims that Pfizer violated the Anti-Kickback Statute ("AKS") and False Claims Act, 31 U.S.C. § 3729 ("FCA"). Pfizer entered into a Settlement Agreement ("Pfizer Settlement") with the United States Department of Justice ("DOJ") and on behalf of the Office of Inspector General ("OIG") of the Department of Health and Human Services relating to the same general conduct at issue in this lawsuit. *See* the Pfizer Settlement, attached as **Exhibit A**; and DOJ Press Release, attached as **Exhibit B**.

10.     The Pfizer Settlement did not address or settle damages sustained by the Assignors and Class Members. The terms of the Pfizer Settlement did not address the claims Plaintiffs set forth in the action.

11.     Plaintiffs bring this lawsuit to redress the damages sustained by the Assignors and Class Members as a result of Defendants' unlawful Scheme to increase the price and dispensed quantity of the Subject Pfizer Drugs.

12.     The improper actions alleged herein allowed Pfizer to maintain supra-competitive prices by eliminating patient price sensitivity that would have benefited consumers and the public at large. Price sensitivity counterbalances Pfizer's desire to inflate prices for medically necessary drugs—which is why Congress relies on price sensitivity as a vital mechanism for combatting supra-competitive pricing. PANF's co-payment assistance program allowed Pfizer to increase the price of the Subject Pfizer Drugs without regard to the relevant market conditions by insulating Pfizer from the realities of patients' inability to afford their co-payment obligations. Not only did this allow Pfizer to charge supra-competitive prices, but also resulted in the induced over-dispensing of the Subject Pfizer Drugs.

13.     Defendants used mail and wires to carry out their racketeering Scheme. Pfizer utilized the wires to transmit their "donations" to PANF, which, in reality, were bribes. PANF would then transmit data using the mail and wires—both directly to Pfizer and to Pfizer through ACS—allowing Pfizer to perform what amounted to return on investments ("ROI") calculations on their "donations." Defendants' conduct violated the AKS, 42 U.S.C. § 1320a-7b, the Travel Act, 18 U.S.C. § 1952 ("Travel Act"), Mail Fraud, 18 U.S.C. § 1341, and Wire Fraud, 18 U.S.C. § 1343, in furtherance of the Scheme.

## II.      PARTIES, JURISDICTION, AND VENUE

### Plaintiffs

14.     Plaintiffs are companies that obtained assignments from the Assignors to recover reimbursement or payment from Defendants. The Assignors provide health insurance coverage, under Medicare Part C and Part D and Medicaid on behalf of their Enrollees. The Assignors made

payments on behalf of, or otherwise became financially responsible for the cost of the illegally inflated and overly dispensed Subject Pfizer Drugs as a result of the Scheme. Said assignments are alleged in the Appendix.

*MSPRC*

15.   MSPRC is a Delaware series limited liability company with its principal place of business located in Coral Gables, Florida. MSPRC's limited liability company agreement provides for the establishment of one or more designated Series.

16.   MSPRC has enumerated rights relating to its designated series pursuant to its limited liability agreement and consistent with Delaware law. Del. Code Ann. Tit. 6, §§ 18-215(a)-(c). Specifically, all rights and benefits arising from assignments to its series shall belong to MSPRC. MSPRC may receive assignments in the name of MSPRC and further associate such assignments with a particular series or may have claims assigned directly to a particular series. In either event, MSPRC and the designated series are authorized to pursue or assert any claim or suit capable of being asserted by any designated series arising from, or by virtue of, an assignment to a designated series. MSPRC retains the legal right to sue on behalf of each designated series and pursue all rights, benefits, and causes of action arising from assignments to a series in its own name or in the name of the designated series. One or more Health Plans irrevocably assigned to certain series of this Plaintiff the right to assert the causes of action alleged in this Complaint. As a result of said assignments, MSPRC, through its operating agreement, is authorized and empowered to obtain the relief sought herein. MSPRC's assignments, samples of which are alleged in detail in the Appendix to this Complaint, are valid and binding contracts.

17.   MSPRC has established various designated series pursuant to Delaware law to maintain various claims recovery assignments separate from other Company assets, and to account

for and associate certain assets with certain particular series. Pursuant to MSPRC's limited liability agreement, all designated series form a part of MSPRC. MSPRC may receive assignments in the name of MSPRC and further associate such assignments with a particular series or may have claims assigned directly to a particular series. In either event, MSPRC will maintain the right to sue on behalf of each series and pursue any and all rights, benefits, and causes of action arising from assignments to a series. Any claim or suit may be brought by MSPRC in its own name or it may elect to bring suit in the name of its designated series.

18.     MSPRC's limited liability agreement provides that any rights and benefits arising from assignments to its series shall belong to MSPRC.

*MSPA*

19.     MSPA is a Florida limited liability company, with its principal place of business located in Coral Gables, Florida. One or more health plans irrevocably assigned to MSPA the right to assert the causes of action alleged in this Complaint. As a result of said assignments, MSPA is authorized and empowered to obtain the relief sought herein. MSPA's assignments, samples of which are alleged in detail in the Appendix to this Complaint, are valid and binding contracts.

*MAO-MSO*

20.     MAO-MSO is a Delaware limited liability company with its principal place of business in Cresskill, New Jersey. One or more health plans irrevocably assigned to MAO-MSO the right to assert the causes of action alleged in this Complaint. As a result of said assignments, MAO-MSO is authorized and empowered to obtain the relief sought herein. MAO-MSO's assignments, samples of which are alleged in detail in the Appendix to this Complaint, are valid and binding contracts.

*Series 44*

21.     Series 44 is a duly organized and existing Delaware series limited liability company with its principal place of business located in Coral Gables, Florida. Series 44's limited liability company operating agreement provides for the establishment of one or more designated series as permitted by Delaware law. Del. Code Ann. Tit. 6, § 18-215(a). Accordingly, Series 44 established various designated series to serve as units of the company for the purpose of maintaining various claims recovery assignments separate from other company assets, and to account for and associate certain assets with certain particular series.

22.     Series 44 has enumerated rights relating to its designated series pursuant to its limited liability agreement and consistent with Delaware law. Del. Code Ann. Tit. 6, §§ 18-215(a)-(c). Specifically, all rights and benefits arising from assignments to its series shall belong to Series 44. Series 44 may receive assignments in the name of Series 44 and further associate such assignments with a particular series or may have claims assigned directly to a particular series. In either event, Series 44 and the designated series are authorized to pursue or assert any claim or suit capable of being asserted by any designated series arising from, or by virtue of, an assignment to a designated series. Series 44 retains the legal right to sue on behalf of each designated series and pursue all rights, benefits, and causes of action arising from assignments to a series in its own name or in the name of the designated series.

*Claims PROV*

23.     Plaintiff, MSP Recovery Claims PROV, Series LLC ("Claims PROV") is a duly organized and existing Delaware series limited liability company with its principal place of business located in Coral Gables, Florida. Claims PROV's limited liability company operating agreement provides for the establishment of one or more designated series as permitted by

Delaware law. Del. Code Ann. Tit. 6, § 18-215(a). Accordingly, Claims PROV established various designated series to serve as units of the company for the purpose of maintaining various claims recovery assignments separate from other company assets, and in order to account for and associate certain assets with certain particular series.

24.     Claims PROV has enumerated rights relating to its designated series pursuant to its limited liability agreement and consistent with Delaware law. Del. Code Ann. Tit. 6, §§ 18-215(a)-(c). Specifically, all rights and benefits arising from assignments to its series shall belong to Claims PROV. Claims PROV may receive assignments in the name of Claims PROV and further associate such assignments with a particular series or may have claims assigned directly to a particular series. In either event, Claims PROV and the designated series are authorized to pursue or assert any claim or suit capable of being asserted by any designated series arising from, or by virtue of, an assignment to a designated series. Claims PROV retains the legal right to sue on behalf of each designated series and pursue all rights, benefits, and causes of action arising from assignments to a series in its own name or in the name of the designated series. One or more Health Plans irrevocably assigned to certain series of Claims PROV the right to assert the causes of action alleged in this Complaint. As a result of said assignments, Claims PROV, through its operating agreement, is authorized and empowered to obtain the relief sought herein. Claims PROV's assignments, samples of which are alleged in detail in the Appendix to this Complaint, are valid and binding contracts.

25.     Defendants' Co-Payment Circumvention Enterprise triggered payment obligations of the Assignors and Class Members. These actions caused the Assignors and Class Members to pay artificially inflated prices and purchase artificially inflated quantities of dispensed Subject

Pfizer Drugs. This illegal and anticompetitive conduct directly harmed Assignors and the Class Members.

**Defendants**

*Pfizer*

26.     Defendant Pfizer is a Delaware corporation with its principal place of business in New York, New York. Pfizer is a pharmaceutical manufacturer. At all relative times, Pfizer advertised, marketed, and sold pharmaceutical products, including the Subject Pfizer Drugs, throughout all states and territories of the United States, including the District of Columbia. Pfizer derived substantial revenue related to the Subject Pfizer Drugs from its business throughout each of the states and territories of the United States, including the District of Columbia.

27.     This Court has personal jurisdiction over Pfizer because the Co-Payment Circumvention Enterprise, to which Pfizer was a party, constitutes doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort under D.C. Code §13-423. In addition, 18 U.S.C. § 1965(d) provides personal jurisdiction over "any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." Pfizer transacts its affairs in the District of Columbia. Pfizer further engaged in substantial and not isolated activity throughout the District of Columbia, including the marketing and sale of the Subject Pfizer Drugs. As a result of the Co-Payment Circumvention Enterprise, the Assignors and Class Members sustained financial and economic injuries in the District of Columbia. Pfizer maintains systematic and continuous contacts in the District of Columbia, and regularly transacts business in the District of Columbia. Pfizer purposefully availed itself of the privilege of conducting activities the District of Columbia, thus benefiting from the protections and benefits of the law and conducting its affairs in the District of Columbia.

*PANF*

28.     PANF is a District of Columbia not for profit entity with its principal place of business in Washington, D.C. PANF operates funds that receive donations from, *among others*, pharmaceutical manufacturers, and uses a portion of those payments to subsidize the co-payment obligations of patients, including Enrollees and the Class Members.

29.     This Court has personal jurisdiction over PANF because PANF is domiciled in, organized under the laws of, and maintains its principal place of business in the District of Columbia. D.C. Code §13-422. PANF engaged in substantial and not isolated activity throughout the District of Columbia relating to the Co-Payment Circumvention Enterprise, resulting in Assignors and the Class Members sustaining financial injuries.

*Advanced Care Scripts*

30.     Defendant ACS is a Florida corporation with its principal place of business in Orlando, Florida. ACS is a specialty pharmacy.

31.     This Court has personal jurisdiction over ACS because the Co-Payment Circumvention Enterprise, to which ACS was a party, constitutes doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort under D.C. Code §13-423. In addition, 18 U.S.C. § 1965(d) provides personal jurisdiction over "any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." ACS transacts its affairs in the District of Columbia. ACS further engaged in substantial and not isolated activity throughout the District of Columbia, including the marketing, sale, dispensing, and distribution of the Subject Pfizer Drugs. As a result of the Co-Payment Circumvention Enterprise, the Assignors and Class Members sustained financial and economic injuries in the District of Columbia. ACS maintains systematic and continuous contacts in the District of Columbia, and

regularly transacts business in the District of Columbia. ACS purposefully availed itself of the privilege of conducting activities the District of Columbia, thus benefiting from the protections and benefits of the law and conducting its affairs in the District of Columbia.

32.    This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331. The causes of action alleged arise under federal law.

33.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a), because Plaintiffs are completely diverse from Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

34.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d), because at least one member of the Class is a citizen of a state different from Defendants and the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

35.    This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367, as the state-law claims are so related to the federal claims as to form part of the same case or controversy.

36.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to this lawsuit occurred in the District of Columbia. Venue is also proper in this district under 18 U.S.C. § 1965(a) because Defendants transact their affairs in the District of Columbia.

## III.    <u>STANDING</u>

37.     The Assignors provide health care benefits to their Enrollees under either: (i) contractual agreements, such as participation and network agreements with capitation and risk sharing arrangements; or (ii) state and federal laws that provide for the reimbursement of payments made by the assignor health plans.

38.    The assignment agreements between the Assignors and Plaintiffs are valid and binding contracts, empowering Plaintiffs to bring and recover on the claims asserted in this lawsuit.

39.     Although Plaintiffs seek recovery on behalf of each of their Assignors who paid for or reimbursed the cost of the Subject Pfizer Drugs at supra-competitive prices and paid for artificially inflated quantities, to establish standing one representative assignment for each Plaintiff is alleged in detail in the Appendix. At all material times hereto, one or more Assignors provided Medicare benefits to MA Plan beneficiaries and one or more Assignors provided Medicaid benefits to Medicaid Plan beneficiaries. The Assignors paid supra-competitive prices and paid for artificially inflated dispensed quantities of the Subject Pfizer Drugs as a result of Defendants' Scheme.

40.     According to data in Plaintiffs' possession, the Assignors were harmed as a result of Defendants' illegal conduct in the approximate sum of **$20,853,617** between 2012 and 2021.

41.     Assignors provided payment for the Subject Pfizer Drugs throughout the United States, its territories, and Commonwealth

## IV.     REGULATORY BACKGROUND

42.     In 1965, Congress amended the Social Security Act to create the Medicare act under Title XVIII of the U.S. Code. The Medicare Act created a federally funded health insurance program for the nation's elderly and disabled. The Medicare Act consists of five parts—Parts A, B, C, D, and E. Parts A and B create, describe, and regulate traditional fee-for-service, government-administered Medicare. Part C outlines the Medicare Advantage program and provides that Medicare beneficiaries may elect for private insurers to deliver their Medicare benefits. Part D provides for prescription drug coverage to Medicare beneficiaries. Part E includes "Miscellaneous Provisions." The Assignors provide Medicare benefits under Parts C and D.

43.     Medicare Part D coverage is a voluntary prescription drug benefit program for Medicare beneficiaries established in 2003. Medicare Part D took full effect in 2006. A beneficiary

may enroll in Part D if he or she lives in the service area of a Part D plan and is entitled to Medicare benefits under Part A or enrolled under Part B.

44.     Unlike Parts A and B, yet similar to Medicare Part C, Medicare Part D is based on a private-market model, where Medicare contracts with private entities, known as Part D "sponsors." These sponsors administer prescription drug plans, and plan sponsors must provide qualified prescription drug coverage.

45.     Part D sponsors submit bids the year before it delivers Part D benefits. The bid contains a per member, per month cost estimate for providing Part D benefits to an average Medicare beneficiary in the geographic area.

46.     If the Part D plan sponsor's bid exceeds the benchmark, the enrolled beneficiary may have to pay the difference as part of a monthly premium. Centers for Medicare and Medicaid Services ("CMS") then provides each Part D plan sponsor with advance monthly payments equal to the Part D plan sponsor's standardized bid.

47.     MA Plans and other Part C entities play an important role in the American healthcare landscape. They provide thousands of Americans with not only health insurance, but with the freedom to go into the marketplace and select the health insurance that best meets their needs. Indeed, "Congress's goal in creating the Medicare Advantage program was to harness the power of private sector competition to stimulate experimentation and innovation."[6] In 2017, 33% of Medicare-eligible individuals got their health insurance from MA Plans.

48.     Similarly, while Medicaid is jointly funded by state and federal governments, it is largely administered by private MCOs. When administered directly by the state, Medicaid operates

---

[6] *In re Avandia, Sales Practices & Products Liability Litigation*, 685 F.3d 353, 363 (3d Cir. 2012).

as a fee-for-service plan—similar to Medicare Parts A & B. As of 2016, over two-thirds of all Medicaid beneficiaries receive their care in risk-bearing MCO plans. A co-pay assistance grant can easily influence these beneficiaries—even if their cost sharing obligation is already low—because Medicaid is specifically designed for individuals and families near or below the poverty line.

## V.      FACTUAL ALLEGATIONS

49.     "Part D enrollees with high drug costs can have difficulty affording their medications when they are in the deductible phase [and] when they reach the coverage gap—the period in which they are required to pay a larger share of total drug costs."[7] Patient assistance programs ("PAP") aim to help financially needy patients afford necessary medications during this difficult period.

50.     There are two ways that pharmaceutical companies give to PAPs. First, manufacturers can establish their own PAPs. "Under this option, pharmaceutical companies give drugs directly to patients who cannot afford them or donate the drugs to a foundation that then gives them to patients. The second option is through independent charity PAPs (herein referred to as "co-payment charities")." *See Cloak of Social Responsibility*. PANF is a purportedly independent charity PAP, or a co-payment charity.

51.     Pharmaceutical companies donate money to co-payment charities, purportedly to help patients who cannot afford their drugs. These patients often have health insurance (usually Medicaid or Medicare), but apply to these charities to help cover all or a portion of their co-payment obligations.

---

[7] Congressional Research Service, *Prescription Drug Discount Coupons and Patient Assistance Programs (PAPs)*, June 15, 2017.

52.     There are two key differences between these two giving options. "First, companies donate drugs in option 1 and money in option 2. Second, pharmaceutical companies receive no money besides a [tax] deduction in option 1, *but under option 2 they receive a [tax] deduction and money from the insurer paying the other portion of the drug costs*. Thus, assistance provided by option 2 reduces out-of-pocket costs to insured patients but do[es] not reduce the price of prescription drugs to the healthcare payer. These are one-sided discounts." *Id*. (emphasis added).

53.     Small donations to a co-payment charity may substantially increase revenue received by a given pharmaceutical company from MA Plans and Medicaid Plans, such as the Assignors.[8]

54.     As pharmaceutical drug company "giving" to co-payment charities rises, the co-payment charity benefits as well. In fact, executives at co-payment charities are among some of the *highest paid executives* in the United States.

55.     Thus, in this context, pharmaceutical companies and co-payment charities have a mutually beneficial purpose—to receive donations and establish disease funds to cover co-payments of the pharmaceutical company's expensive specialty drugs and ensure federal healthcare programs bear the cost of these drugs, so the co-payment charity can show "results" for the pharmaceutical company, justifying increased donations.

---

[8] *See* Michael Banigan, *A Guide to Patient Assistance Programs: What You Need to Know to Promote Patient Advocacy and Maximize Charitable Contributions*. Chronic Disease Fund Inc. (2016) (providing that pharmaceutical companies can calculate their profitability, or "charitable margin," as a result of their donations to co-payment charities and can stand to earn 220 percent charitable margins). *See also Cloak of Social Responsibility* (explaining that example of "charitable margin" can yield a "charitable margin of 220 percent"); *see also* Citi Research, *The Straw that Could Break the Camel's Back*: *DOJ/OIG Action on Foundation Funding Could Severely Impede Industry Returns*, May 16, 2017 [hereinafter *Citi Research*] (explaining that "[e]ach $1m industry donation to a charitable foundation to enable Medicare patients Xtandi access or similar high priced drugs has the potential to generate up to $21m for the sponsor company, **funded by the US Government.**") (emphasis added).

56.     Given these shared economic incentives, it's no surprise that charitable assistance from co-payment charities increased from $11 million in 2004 to nearly $868 million in 2014. *See Cloak of Social Responsibility* (noting that from 2007 to 2009, during the Great Recession, pharmaceutical giving increased by nearly $1.5 billion, while overall corporate giving decreased by $1.2 billion). The chart below details total giving for certain co-payment charities, including PANF, from 2001 to 2014.

| Table A-1. Total Giving in Dollars for Independent Charity Patient Assistance Programs (PAPs), 2001-2014 | | | | | | |
|---|---|---|---|---|---|---|
| | Patient Access Network Foundation[a] | Chronic Disease Fund/ Good Days[b] | Caring Voice Coalition[c] | Healthwell Foundation[d] | Patient Services | Subtotal: Independent Charity PAPs |
| 2001 | — | — | — | — | $2,328,611 | $2,328,611 |
| 2002 | — | — | — | — | $3,296,181 | $3,296,181 |
| 2003 | — | — | — | — | $5,118,345 | $5,118,345 |
| 2004 | — | — | $80,383 | — | $6,982,842 | $11,301,748 |
| 2005 | $7,557,312 | $5,597,689 | $5,257,803 | $15,856,793 | $15,719,269 | $49,988,866 |
| 2006 | $18,652,834 | $66,279,917 | $9,850,206 | $47,289,619 | $15,333,700 | $157,406,276 |
| 2007 | $24,880,629 | $63,551,700 | $15,816,549 | $59,391,157 | $21,467,030 | $185,107,065 |
| 2008 | $32,825,596 | $82,133,885 | $27,943,050 | $57,521,456 | $35,269,942 | $235,693,929 |
| 2009 | $37,323,252 | $136,713,152 | $37,530,533 | $71,425,660 | $29,594,995 | $312,587,592 |
| 2010 | $37,562,665 | $172,488,043 | $38,166,963 | $84,233,714 | $37,440,434 | $369,891,819 |
| 2011 | $28,379,485 | $195,647,202 | $46,827,156 | $49,521,777 | $39,983,874 | $360,359,494 |
| 2012 | $108,460,641 | $182,365,638 | $58,221,721 | $36,995,288 | $50,332,148 | $436,375,436 |
| 2013 | $174,340,174 | $194,448,004 | $67,435,466 | $31,135,498 | $60,897,475 | $528,256,617 |
| 2014 | $496,427,781 | $170,628,203 | $98,027,589 | $29,089,150 | $73,735,080 | $867,857,753 |

*Source:* ProPublica's Nonprofit Explorer Database.
*Notes:* These totals come from line 13 titled "Total Grants" on Form 990, although for some entities before 2008, the totals come from line 23, part II.
[a] Excluded 2004 return because it was an initial return.
[b] Excluded 2004 return because it was an initial return.
[c] Excluded 2002 return because it was an initial return and their reporting years run July to June.
[d] Excluded 2004 return because it was an initial return.

57.     The rise of co-payment charities and pharmaceutical corporate giving to such charities (with the economic incentives detailed above) is tied to the enactment of public insurance programs expanding the number of Americans with prescription drug coverage, the growth of specialty drugs, and the federal anti-kickback law.

58.     First, this increased giving to co-payment charities occurred during a period in which there was a surge in the number of Americans with prescription drug coverage as a result of the enactment of Medicare Part D and, subsequently, the passing of the Affordable Care Act in

2010 ("ACA"), which expanded Medicaid prescription drug benefits. "Before these public insurance expansions, federal government spending on prescription drugs was 25 percent of total spending in 2005. In 2014 it was 41 percent." *See Cloak of Social Responsibility*.

59.     Specialty drug prices are set by drug manufacturers with an intimate knowledge of the drug market. This knowledge enables manufacturers to set supra-competitive drug prices by using PAPs to circumvent beneficiary co-payment obligations, thus eliminating price sensitivity.

60.     Second, along with these public insurance programs, specialty drugs (generally defined as expensive prescriptions requiring extra handling or administration in treating complex diseases) have contributed to the growth of co-payment charities. "In recent years, spending for specialty drugs has grown faster than spending for other pharmaceuticals. Although specialty medications account for only one percent of prescriptions, they account for almost a third of U.S. prescription spending. For Medicare Part D, specialty drugs accounted for a quarter of a percent of prescriptions in 2013 but eleven percent of total drug cost." *Id*.

61.     Co-payment charities allow pharmaceutical companies to manage price sensitivity for these more expensive specialty drugs. The OIG noted that PAPs "may steer patients toward and lock them into a particular manufacturer's product, even when other equally effective and less costly alternatives are available." *Id*.

62.     Moreover, the rise of co-payment charities stemmed from federal anti-kickback laws. The AKS made the receipt of kickbacks, bribes, or rebates in connection with items or services covered by the Medicare and Medicaid programs a crime. The AKS makes it a crime to knowingly and willfully offer, pay, solicit or receive any payment to induce a person to purchase or recommend any good, service, or item covered under a federal health care program. *See* 42 U.S.C. § 1320a-7b(b).

63.     As it relates to PAPs, the OIG has stated that the AKS could be violated "if a donation is made to a PAP to induce the PAP to recommend or arrange for the purchase of the donor's federally reimbursable items," as well as if a PAP's grant of financial assistance to a patient is made "to influence the patient to purchase (or induce the patient's physician to prescribe) certain items." *Supplemental Special Advisory Bulletin: Independent Charity Patient Assistance Programs*, 79 Fed. Reg. 31120, 31121 (May 30, 2014), attached as **Exhibit D**.

64.     Congress has determined that any Medicare or Medicaid claim "that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim" for purposes of the FCA. *See* 42 U.S.C. § 1320a-7b(g).

## VI.   OIG GUIDANCE FOR CO-PAYMENT CHARITIES

65.     The OIG has provided guidance to co-payment charities about compliance with applicable laws and regulations, including the AKS and FCA. In this guidance, the OIG made clear that such charities will violate those laws and regulations if they do not follow specified rules. Those rules ensure that a pharmaceutical manufacturer cannot control a co-payment charity or receive information from such a charity that would allow the manufacturer to link the amount it donates to additional profits from the sale of a particular drug.

66.     In 2005, the OIG issued a special advisory bulletin on PAPs ("2005 Bulletin"). The 2005 Bulletin provided that certain cost-sharing subsidies provided by bona fide, independent PAPs unaffiliated with drug manufacturers do not raise AKS concerns, even if the PAPs receive manufacturer contributions. *See OIG Special Advisory Bulletin on Patient Assistance Programs for Medicare Part D Enrollees*, 70 Fed. Reg. 70623 (Nov. 22, 2005), attached as **Exhibit C.** The 2005 Bulletin also set forth factors that the OIG considers to be "fundamental" to a properly structured, independent, bona fide PAP, including the following:

a. No drug manufacturer or donor exerts any direct or indirect influence or control over the PAP;

b. The PAP awards assistance in a truly independent manner that severs any link between the drug manufacturer donors funding and the beneficiary;

c. The PAP awards assistance regardless of the drug manufacturer's interests, or the beneficiary's choice of product, provider, practitioner, supplier, or Part D drug plan;

d. The PAP provides assistance based on a reasonable verifiable, and uniform measure of financial need applied in a consistent manner; and

e. The drug manufacturer does not solicit or receive data from the PAP that would allow the manufacturer to substantiate the amount of its donations with the number of subsidized prescriptions for its products. *Id.* at 70626-27 ("Simply put, the independent charity PAP must not function as a conduit for payments by the pharmaceutical manufacturer to patients and must not impermissibly influence beneficiaries drug choices.")

67.     In 2014, the OIG issued an updated bulletin raising concerns about the conduct of co-payment charities and intensifying its scrutiny of arrangements between pharmaceutical companies and co-payment charities ("2014 Bulletin"). *See Supplemental Special Advisory Bulletin: Independent Charity Patient Assistance Programs*, 79 Fed. Reg. 31120 (May 30, 2014), attached as **Exhibit D.** In the 2014 Bulletin, the OIG stated that although PAPs can provide an important safety net to financially needy patients, these programs also present a risk of fraud, waste, and abuse with respect to federal health care programs if they are not independent enough from donors. *Id.*

68.     The OIG noted three additional areas of concern related to disease funds, eligible recipients, and the conduct of donors, and required co-payment charities to certify to the OIG that:

a. The co-payment charity will not define its disease funds by reference to specific symptoms, severity of symptoms, method of administration of drugs, stages of a particular disease, type of drug treatment, or any other way of narrowing the definition of widely recognized disease states.

b. The co-payment charity will not maintain any disease fund that provides co-payment assistance for only one drug, or only the drugs made or marketed by one manufacturer or its affiliates; and

c.  The co-payment charity will not limit its assistance to high-cost or specialty drugs. Instead, the co-payment charity will make assistance available for all products, including generic or bioequivalent drugs covered by Medicare or other insurers, when prescribed for the treatment of the disease state(s) covered by the fund. *Id.*

69.   With respect to the "conduct of donors," the 2014 Bulletin reiterated its prior focus (from the 2005 Special Advisory Bulletin) on co-payment charities not giving a "donor any information that would enable a donor to correlate the amount or frequency of its donations with the number of aid recipients who use its products or services or the volume of those products supported by the PAP." *Id.* Notably, the OIG warned that:

> [t]he procedures described in these certifications are a critical safeguard and a material fact upon which we have relied in issuing favorable advisory opinions regarding Independent Charity PAPs. These opinions do not address actions by donors to correlate their funding of PAPs with support for their own products. Such actions may be indicative of a donor's intent to channel its financial support to co-payments of its own products, which would implicate the antikickback statute.

## VII.   THE CO-PAYMENT CIRCUMVENTION ENTERPRISE PERMITTED PFIZER TO CHARGE SUPRA-COMPETITIVE PRICES FOR AND ARTIFICIALLY INFLATE THE QUANTITY OF SUBJECT PFIZER DRUGS DISPENSED

70.   As part of the Scheme, Defendants artificially increased the quantity of claims the Assignors and Class Members paid for the Subject Pfizer Drugs by pushing patients away from Pfizer's free drug program, forcing the Assignors and Class Members to pay for the Subject Pfizer Drugs at artificially supra-competitive prices.

71.   For example, Plaintiffs' analysis of the Assignors' data displays a continuous, significant increase in the annual total dosage units for Tikosyn until the DOJ investigation and subsequent Settlement Agreement:



72.     As seen in the chart above, the Scheme allowed Defendants to artificially increase the quantity of Tikosyn prescriptions dispensed, for which the Assignors were responsible for payment.

**Sutent**

73.     Sutent is a chemotherapy drug used, among other things, to treat kidney, pancreatic, and intestinal cancers.

74.     Sutent cost Medicare Part D around $183 million in 2016 before rebates, or about $47,000 per patient.

75.     Medicare's spending for each unit of Sutent increased around 80% since the illegal Scheme began in or around 2012.

76.     The change in average spending by Medicaid per dosage unit of Sutent increased by 16.8% from 2015 to 2016 with the annual growth rate in average spending per dosage unit from 2012 to 2016 increasing by 15.6%. The average spending per dosage unit in 2012 was $233.19, with an average spending per claim totaling $6,798.20. In only four years, the average spending per dosage unit jumped to $416.68, with an average spending per claim totaling $10,084.44.

77.    CMS Medicare Part D data shows that Medicare spending for Sutent rose from $104 million in 2012, to more than $193 million in 2018, despite paying for over 100,000 fewer dosages in 2018 than in 2012.

78.    CMS Medicare Part D data further provides that the annual growth rate in spending per dose rose during this 2012-2016 period at a rate of 15.78%—from $217.58 per dose in 2012, to $239.59 per dose in 2013, to $259.98 per dose in 2014, to $338.38 per dose in 2015, to $391.05 per dose in 2016.

79.    The Assignors' data for their Enrollees yields similar findings.

80.    According to the data currently in Plaintiffs' possession, as a result of the illegal Scheme, Assignors paid for overpriced and induced over dispensed Sutent prescriptions on behalf of their Enrollees in a total amount of around **$11,636,802**.

81.    By comparison, and upon information and belief, in the years before the existence of the Co-Payment Circumvention Enterprise, Assignors only paid for $1,443,769 for Sutent prescriptions.

**Inlyta**

82.    Inlyta is a chemotherapy drug used, among other things, to treat kidney cancer.

83.    Inlyta cost Medicare about $73 million in 2016, or about $57,000 per patient.

84.    Medicare spent 34% more on each unit of the drug in 2016 than it did in 2012.

85.    CMS Medicare Part D data shows that for Inlyta, Medicare spending rose from $22 million in 2012, to $57 million in 2013, to $72 million in 2014, to $80 million in 2015, and $73 million in 2016.

86.    CMS Medicare Part D data further provides that the usage went down when the Scheme ended. Total units provided fell by over 100,000 from 2015 to 2016, in the final year of

the Scheme, with another massive drop-off when the Pfizer Settlement timeline ended; with the total units provided dropping by more than an additional 100,000 from 2016 to 2017.

87.     Assignors' data for their Enrollees yields similar findings.

88.     According to the data currently in Plaintiffs' possession, as a result of the illegal Scheme, Assignors paid for their Enrollees' overpriced and over dispensed Inlyta prescriptions in a total amount of *at least* **$5,656,747**.

**Tikosyn**

89.     Tikosyn is a drug used, among other things, to treat arrhythmia (irregular heartbeat) in patients with atrial fibrillation or atrial flutter.

90.     In the final three months of 2015, Pfizer increased the list price of 40 Tikosyn capsules from $220 to $317. Planning a price increase to Tikosyn, Pfizer worked with PANF to create and finance a fund for Medicare patients with a specific irregular heartbeat.

91.     In the nine months after Pfizer and PANF created the Tikosyn fund, nearly all the beneficiaries of PANF's fund were Tikosyn patients.

92.     The average annual growth rate in spending by Medicaid per dosage unit of Tikosyn increased 18% from 2012 to 2016. The average spending per dosage unit in 2012 was $4.08, with an average spending per claim totaling $252.11. In a matter of only four years, the average spending per dosage unit jumped to $7.90, with an average spending per claim totaling $502.65.

93.     In 2016, Tikosyn cost Medicare about $107 million before rebates.

94.     CMS Medicare Part D data shows that for Tikosyn, Medicare spending doubled from $51 million in 2012, to $113 million in 2015.

95.     CMS Medicare Part D data further provides that the average Annual Growth Rate in Spending per dose rose during this 2012-2016 period rose at a rate of 18.47%—from $3.99 per dose in 2012, to $7.86 per dose in 2016.

96.     In fact, from just 2015 to 2016, the Annual Growth Rate in Spending per dose increased 41%.

97.     As of 2020, despite only costing $3.99 in 2012, the average spending per dosage unit spent by Medicare on Tikosyn was $10.19.

98.     Assignors' data for their Enrollees yields similar findings.

99.     According to data in Plaintiffs' possession, as a result of the illegal Scheme, Assignors paid for overpriced and overly dispensed Tikosyn prescriptions on behalf of their Enrollees in a total amount of *at least* **$3,560,068**.

100.    By contrast, and upon information and belief, in the years before the existence of the Co-Payment Circumvention Enterprise, Assignors only paid for $384,612 for Tikosyn prescriptions.

101.    Pfizer's ability to exponentially increase the prices of, and quantity dispensed, of the Subject Pfizer Drugs year over year would not have been possible but for the illegal Co-Payment Circumvention Enterprise.

102.    As explained by the DOJ, from January 1, 2012 through December 31, 2016,

> Pfizer made donations to PANF and used PANF as a conduit to pay the copay obligations of Medicare patients taking the Subject Drugs. With respect to Sutent and Inlyta, Pfizer contracted with Advanced Care Scripts ("ACS") to act as a third-party specialty pharmacy for Sutent and Inlyta patients prescribed those products, including Medicare patients. In order to generate revenue and instead of giving away Sutent and Inlyta for free to Medicare patients who met the financial qualifications of Pfizer's existing free drug program, Pfizer worked with ACS to transition some portion of these patients to PANF, which covered the patients' Medicare copays and caused Medicare claims to result from the filling of the patients' Sutent and Inlyta prescriptions. In connection with this initiative, Pfizer

made donations to PANF and thereafter received data from PANF, via ACS, confirming that PANF funded the Medicare copays of Sutent and Inlyta patients. With respect to Tikosyn, Pfizer raised the wholesale acquisition cost of a package of 40 .125 mg capsules of the drug from $220.24 to $317.15 in the last three months of 2015. Knowing the price increase would increase Medicare beneficiaries' copay obligations for Tikosyn, which could result in more Medicare patients needing financial assistance to fill their Tikosyn prescriptions, Pfizer worked with PANF to create and finance a fund for Medicare patients being treated for arrhythmia with atrial fibrillation or atrial flutter. Pfizer coordinated the timing of the opening of PANF's fund for these patients with the implementation of a Tikosyn price increase, and Pfizer then began referring to PANF any Medicare patients who needed financial assistance to meet their newly-increased copays for the drug. For the next nine months, Tikosyn patients accounted for virtually all of the beneficiaries of PANF's fund for Medicare patients being treated for arrhythmia with atrial fibrillation or atrial flutter.

(*See* **Exhibit A.** Pfizer Settlement).

## The DOJ/Pfizer Settlement

103.    The DOJ prosecuted Pfizer and PANF for their roles in the Scheme, which also defrauded the federal government.

104.    This resulted in a settlement in which Pfizer agreed to pay $23,850,000[9] plus interest to the United States after the DOJ alleged that Pfizer's use of PANF as a conduit violated the AKS and the FCA.

105.    The DOJ investigation into the Scheme, represents one part of a much larger ongoing investigation by the DOJ and OIG, along with the U.S. Attorney's Office for the District of Massachusetts, into schemes by various drug manufacturers and co-payment charities that

---

[9] The DOJ Settlement only pertained to illegal conduct by Pfizer from January 1, 2012 through December 31, 2016. Based on the data in Plaintiffs' possession relating to claims paid *before* 2012 by Assignors, Plaintiffs have a good-faith belief that discovery will reveal that the Co-Payment Enterprise and the illegal conduct began as early as 2009.

violated the AKS and FCA.[10] As recognized by pharmaceutical-industry financial analysts, these investigations could "impede industry returns."[11]

106.    The May 24, 2018 settlement between Pfizer and the DOJ was based on the government's claims that Pfizer's conduct violated the AKS and FCA, thereby shifting and increasing drug costs to a federal healthcare program (in that case, Medicare).

107.    The DOJ alleged the following about Sutent and Inlyta:

> Pfizer contracted with ACS to act as a third-party specialty pharmacy for Sutent and Inlyta patients prescribed those products, including Medicare patients. In order to generate revenue and instead of giving Sutent and Inlyta to Medicare patients who met the financial qualifications of Pfizer's existing free drug program, Pfizer worked with ACS to transition some portion of those patients to the foundation, which covered the patients' Medicare copays and caused Medicare claims to result from the filling of the patients' Sutent and Inlyta prescriptions. In connection with this initiative, according to the government's allegations, Pfizer made donations to the foundation and thereafter received data from the foundation, via ACS, confirming that the foundation funded the Medicare copays of Sutent and Inlyta patients.

(*See* **Exhibit B** – DOJ Press Release)

---

[10] Other recent results involving the resolution of AKS and FCA claims brought by the United States on behalf of Medicare (not Medicare Advantage) against drug manufacturers participating in improper schemes with co-payment charities include, but are not limited to: (i) Jazz Pharmaceuticals PLC ("Jazz") agreeing in May 2018 to pay the United States $57 million related to claims involving Jazz's relationship with another co-payment charity, Caring Voice Coalition ("CVC") to fund co-payment for Jazz's narcolepsy drug Xyrem; (ii) United Therapeutics agreed to pay the United States $210 million to resolve the United States' AKS and FCA claims on behalf of Medicare based on United Therapeutics' relationship with CVC; (iii) H. Lundbeck A/S ("Lundbeck") agreeing in June 2018 to pay the United States $52.6 million related to claims involving Lundbeck's relationship with CVC to fund co-payment for Lundbeck's Huntington's Disease drug Xenazine; and (iv) Actelion Pharmaceuticals U.S., Inc. ("Actelion") agreeing in December 2018 to pay the United States $360 million related to claims involving Actelion's relationship with CVC to fund co- payment for Actelion's drugs Tracleer, Ventavis, Veletri, and Opsumit.

[11] *See Citi Research* (noting that "[t]he ongoing multiple DOJ/OIG investigations into financial donations by pharmaceutical companies to independent foundations has the potential to severely limit future revenues for several high-priced blockbuster Medicare Part D drugs through (i) lowered overall funding for patient out-of-pocket assistance (ii) lesser ability for individual pharmaceutical donors to guide their funding towards specific drugs.").

108.    The United States alleged the following about Tikosyn:

With respect to Tikosyn, Pfizer raised the wholesale acquisition cost of a package of forty .125 mg capsules of the drug by 44 percent during the last three months of 2015.  Knowing the price increase would increase Medicare beneficiaries' copay obligations for Tikosyn, which could result in more Medicare patients needing financial assistance to fill their Tikosyn prescriptions, Pfizer allegedly worked with the foundation to create and finance a fund for Medicare patients being treated for arrhythmia with atrial fibrillation or atrial flutter.  According to the allegations in the settlement agreement, Pfizer coordinated the timing of the opening of the fund for these patients with the implementation of a Tikosyn price increase, and Pfizer then began referring to the foundation any Medicare patients who needed financial assistance to meet their newly-increased copays for the drug. For the next nine months, Tikosyn patients accounted for virtually all of the beneficiaries of the fund.

(*See* **Exhibit A** – Pfizer Settlement**)**

109.    Pfizer's settlement with the DOJ does not redress the harms suffered by the Assignors and Class Members.

110.    PANF and another co-payment assistance charity, Chronic Disease Fund ("CDF"), also entered into settlement agreements with the DOJ for engaging in similar illegal schemes with four other pharmaceutical companies. (*See* Charity Settlement Agreements, attached as **Exhibits E** and **F**).

111.    On October 25, 2019, CDF and PANF entered into settlements with the DOJ in which they agreed to pay a combined $6 million to resolve allegations that the two "charities" routinely engaged in precisely the type of conduct that is the subject of this complaint. As stated by the DOJ:

CDF and PANF worked with various pharmaceutical companies to design and operate certain funds that funneled money from the companies to patients taking the specific drugs the companies sold. These schemes enabled the pharmaceutical companies to ensure that Medicare patients did not consider the high costs that the companies charged for their drugs. The schemes also minimized the possibility that the companies' money would go to patients taking competing drugs made by other companies…CDF and PANF functioned not as independent charities, but as pass-throughs for specific pharmaceutical companies to pay kickbacks to Medicare patients taking their drugs…. As a result, CDF and PANF enabled their 'donors'

(the pharmaceutical companies) to undermine the Medicare program at the expense of American taxpayers…. Both the Chronic Disease Fund and the Patient Access Network used their status as charities to shield the illegal activities of pharmaceutical companies seeking to maximize profits.[12]

112.     Thus, the DOJ's investigation revealed that CDF and PANF did not operate as independent charities, but acted as conduits for pharmaceutical companies, including Pfizer, to increase prices for and sale quantities of the drugs.

113.     PANF used the Co-Payment Circumvention Enterprise to boost their executive salaries. With the increase in PANF bribes (disguised as donations) from Pfizer, came an increase in PANF executive salaries. PANF has had two presidents since 2011: Patrick L. McKercher and Daniel Klein. Mr. McKercher left his role as President and Mr. Klein began as President in November 2014. Mr. McKercher and Mr. Klein were among a handful of executives whose compensation is set forth in Part VII of PANF's annual Form 990 Tax Filings.[13] PANF's Form 990 Tax Filings show that the total reported compensation between McKercher and Klein rose by more than 320% between 2011 and 2016, from $89,000 in 2011 to over $377,000 in 2016.

114.     This salary increase has a direct correlation to the amounts of bribes/donations PANF received from pharmaceutical manufacturers, like Pfizer. PANF's contributions and grants increased from $89 million in 2011, to $179 million in 2012, to $313 million in 2013, to $659 million in 2014, to more than $800 million in 2015. Attached as **Exhibit G** – PANF's Form 990 Tax Filings.

---

[12] *See* DOJ, Foundations Resolve Allegations of Enabling Pharmaceutical Companies to Pay Kickbacks to Medicare Patients, (Oct. 25, 2019) https://www.justice.gov/usao-ma/pr/foundationsresolve-allegations-enabling-pharmaceutical-companies-pay-kickbacks-medicare.
[13] See **Exhibit G** - PANF's Form 990 Tax Filings.

115.     According to Pfizer, it donated $2.3 million to PANF in 2011. That same year, Assignors paid about $926,300 for 2,483 prescriptions of Subject Pfizer Drugs. *See* **Exhibit H** – Pfizer donations to PANF.

116.     Pfizer reported that in 2012, they increased their donations to PANF in the amount of $7.85 million. That same year, the amount the Assignors paid similarly increased to about $2,008,418 for 2,887 prescriptions of Subject Pfizer Drugs.

117.     In 2015 Pfizer's reported that its donations to PANF surpassed $16 million. Similarly, that same year, the amount Assignors paid increased to about $3,316,104 for 6,273 prescriptions of Subject Pfizer Drugs.

118.     In 2016, the DOJ began issuing subpoenas probing into pharmaceutical manufacturers' misuse of 501(c)(3) organizations, including PANF, as conduits to pay the copay obligations of Medicare and Medicaid beneficiaries. That same year, Pfizer's donations to PANF *decreased* by about $5 million, for a total of $10.95 million. Similarly, the amount Assignors paid *decreased* by about $1 million in 2016, for a total of $2,355,302.19 for just 2,766 prescriptions of Subject Pfizer Drugs (a substantial drop in prescriptions from the prior year).

119.     Furthermore, in 2016, total donations to PANF *decreased* by about $219,214,574.00. **Exhibit G** – PANF's Form 990 Tax Filings.

120.     In 2017 and 2018, while the DOJ's investigation of Pfizer was ongoing, the amount billed to and paid by Assignors continued to *decrease* to $771,870.92 in 2017 for just 418 prescriptions of Subject Pfizer Drugs, and $270,149.64 in 2018 for just 90 prescriptions of Subject Pfizer Drugs.

121.     Also, in 2019, one year after the DOJ entered into Settlement Agreements with the various pharmaceutical manufacturers for engaging in the same Scheme alleged here, PANF

reported that it had received $367,120,360 *less than* it had received in 2015 (just before the DOJ's investigation).

### The DOJ ACS Settlements

122.    ACS's involvement in an illegal bribery scheme is not an isolated incident. In fact, ACS has been investigated for, and settled claims for, its involvement in at least two other bribery schemes that follow the same pattern outlined here.

123.    In August 2020, ACS paid the DOJ $3.5 million to settle claims involving similar conduct being alleged here. *See* **Exhibit J** – ACS-Teva DOJ Settlement Agreement. The DOJ alleged that ACS "conspired with pharmaceutical manufacturer Teva Neuroscience, Inc. (Teva), to enable Teva to pay kickbacks to Medicare patients taking Copaxone, a Teva drug approved for treatment of multiple sclerosis." *See* **Exhibit I** – DOJ Press Release re ACS-Teva Settlement Agreement.

124.    As part of the settlement:

ACS acknowledged certain facts, including that it relayed data from two foundations, Chronic Disease Fund (CDF) and The Assistance Fund (TAF), to Teva so that Teva could correlate its payments to the foundations with the amounts of money the foundations spent on Copaxone patients. ACS further acknowledged that, when the foundations lacked funding and were not accepting new applications for Medicare co-pay coverage, ACS provided regular updates to Teva on the number of Medicare Part D patients serviced by ACS who had prescriptions for Copaxone, met the criteria for foundation co-pay coverage, and were awaiting foundation co-pay coverage. At least one ACS employee understood that Teva would use the number of waiting Copaxone patients to help determine the amount of its next payment to CDF or TAF. Teva sometimes provided ACS with advance notice of its payments to CDF or TAF. Once ACS learned that CDF or TAF had re-opened its co-pay fund, ACS promptly would send the foundation a "batch file" that consisted almost entirely of Copaxone patients' applications for Medicare co-pay coverage. Thereafter, ACS often received notice from the foundation that most or all of the applications submitted by ACS had been approved to receive co-pay funding. When a Copaxone patient's application was approved, ACS no longer included that patient in its reports to Teva on the number of Copaxone patients awaiting foundation co-pay coverage.

**Exhibit I** – DOJ Press Release re ACS-Teva Settlement Agreement.

125.    Similarly, as part of the DOJ's investigation into Biogen, ACS agreed to pay $1.4 million to resolve allegations that it "conspired with Biogen to enable Biogen to use CDF and TAF as conduits for Biogen to pay Medicare co-pays for Avonex and Tysabri patients." **Exhibit K** – DOJ Press Release re ACS-Biogen Settlement Agreement.

126.    As part of the ACS-Biogen settlement agreement, ACS acknowledged several facts underlying the investigation, including the following:

> ACS received from Biogen information about certain Avonex patients whom ACS understood Biogen to have identified as being eligible for Medicare Part D prescription drug coverage. For identified Avonex patients who did not yet have Medicare Part D coverage, ACS assisted them in obtaining Medicare Part D coverage. Once Avonex patients had enrolled in a Medicare Part D plan, ACS assisted eligible patients in obtaining coverage for their Medicare Part D co-pays from third party foundations, including Chronic Disease Fund ("CDF") and The Assistance Fund ("TAF"). Biogen paid ACS a per-patient fee for its services. Once ACS had assisted an Avonex patient in obtaining co-pay coverage from a foundation, ACS often dispensed Avonex to that patient and submitted claims to Medicare Part D plans, or their agents, for the Avonex it dispensed.

> Biogen sometimes provided ACS with advance notice of its intention to make a payment to CDF's or TAF's MS fund. In those instances, once ACS learned that CDF or TAF had re-opened its co-pay fund following such advance notice of a Biogen payment, ACS promptly would send the foundation a "batch file" that consisted almost entirely of Avonex patients' applications for Medicare co-pay coverage. Thereafter, ACS often received notice from the foundation that most or all of the applications submitted by ACS for Biogen patients had been approved to receive co-pay funding. At certain times, ACS shared with Biogen lists of Avonex patients for whom ACS had helped to obtain co-pay coverage from a foundation. At least one ACS employee understood that Biogen used that information to correlate its payments to CDF and TAF with the amounts of money the foundations needed to cover Medicare co-pays for Avonex patients.

> In 2012 and 2013, at Biogen's direction, ACS also assisted Tysabri patients in obtaining coverage for their Medicare Part B co-pays from TAF and/or CDF. ACS understood that patients seeking co-pay funding for Medicare Part D drugs typically applied for and received grants for such funding in the first quarter of each calendar year, and that patients seeking co-pay funding for Medicare Part B drugs, such as Tysabri, typically applied for and received co-pay grants for such funding throughout the calendar year. In 2012 and 2013, Tysabri was the only MS drug for

which the Medicare Part B program provided reimbursement. On certain occasions in 2012 and 2013 when Biogen provided ACS advance notice of its intention to make a payment to TAF or CDF and ACS learned that TAF or CDF re-opened its co-pay fund following such advance notice of a payment from Biogen, ACS transmitted co-pay funding applications to CDF or TAF for Tysabri patients identified by Biogen, and those patients received co-pay funding from TAF or CDF.

**Exhibit L** – ACS-Biogen Settlement Agreement.

## VIII.   <u>OIG ADVISORY OPINIONS TO PANF</u>

127.    On December 19, 2007, the OIG issued OIG Advisory Opinion No. 07-18 to PANF. ("2007 PANF Advisory Opinion"), attached as **Exhibit M**.

128.    The OIG modified the 2007 PANF Advisory Opinion on October 11, 2011, permitting PANF to move towards a specialty therapeutics model, attached as **Exhibit N**.

129.    On October 26, 2015, the OIG issued its Notice of Modification of OIG Advisory Opinion No. 07-18 ("Modified PANF Advisory Opinion"), attached as **Exhibit O**.

130.    The Modified PANF Advisory Opinion noted that in 2007, the OIG's Advisory Opinion was "a favorable opinion regarding the Charity's operation of a PAP that provides cost-sharing assistance primarily for high-cost medications to patients who have been diagnosed with one of the disease states for which the Charity maintains a disease fund and who meet certain financial need criteria."

131.    In May 2014, the OIG sent PANF a letter noting that the 2011 PANF Advisory Opinion "approved certain features that [the OIG] have since determined are problematic." attached as **Exhibit P**.

132.    The OIG proposed certifications to address the "problematic" features to PANF.

133.    PANF responded to OIG's request and provided several certifications, including "[PANF] determines eligibility according to a reasonable, verifiable, and uniform measure of

financial need that is applied in a consistent manner." *See* **Exhibit G** – PANF's Form 990 Tax Filings.

134.    As part of PANF's Charity Settlement, PANF entered into an Integrity Agreement ("IA") which noted that, in consideration of settling the claims involved in the DOJ settlement, "OIG agrees it will not rescind or terminate [the 2007 PANF Advisory Opinion]." Attached as **Exhibit Q**.

135.    Although PANF was required to enter into an IA with the DOJ, this option was permitted rather than the DOJ issuing a full rescission of the Advisory Opinions it issued before to PANF.

## IX.    THE IMPACT ON PLAINTIFFS AND THE CLASS MEMBERS

136.    Any settlements between the Defendants, individually or otherwise, did not settle any claims that the Assignors and Class Members have against Defendants.

137.    Defendants' misconduct damaged the Assignors and Class Members.

138.    Defendants' conduct eliminated price sensitivity of patients purchasing and the dispensing of the Subject Pfizer Drugs, which in turn enabled Pfizer to quickly raise the price of the Subject Pfizer Drugs to artificially supra-competitive prices. The Assignors and Class Members bore the cost. By PANF providing data (via ACS) to Pfizer, PANF could demonstrate "results"—if Pfizer "donated" money to PANF, it increased revenue, not only through the number of patients shifted from Pfizer's free drug program to the co-payment assistance program, but also by its ability to artificially raise prices to supra-competitive levels.

139.    Defendants' conduct caused MA Plan and Medicaid Plan beneficiaries to purchase the Subject Pfizer Drugs, pharmacists to dispense the Subject Pfizer Drugs, and the Assignors and Class Members to pay for or reimburse the cost to purchase the Subject Pfizer Drugs;

a. Under Defendants' collusive bribery scheme, Pfizer routinely obtained data from PANF through ACS, a specialty pharmacy, detailing how many patients, including Medicare and Medicaid patients, on each Subject Pfizer Drug PANF had assisted and how much PANF had spent on those patients;

b. In deciding whether and how much money to send to PANF, Pfizer considered the revenue it would receive from prescriptions for Medicare and Medicaid patients who received assistance from PANF to cover their co-payments for the Subject Drugs;

c. Pfizer used data from PANF to confirm that Pfizer's revenue far exceeded the amount of Pfizer's bribes to PANF;

d. Pfizer ensured that MA Plans and Medicaid Plans bore the cost of the Subject Pfizer Drugs by employing a policy of not permitting Medicare and Medicaid patients to participate in Pfizer's free drug program, which was open to other financially needy patients—including Medicare and Medicaid patients who could not afford their co-payments for the Subject Pfizer Drugs; and

e. Pfizer and ACS funneled Medicare and Medicaid patients prescribed the Subject Pfizer Drugs to PANF, which upon PANF approving coverage of patients' co-payments, triggered Assignor and Class Member obligations to cover the cost of the Subject Pfizer Drugs.

140.    Because of Defendants' Scheme, the Assignors and Class Members paid for prescriptions they would not have otherwise paid. There was a direct relationship between the misconduct at issue and the payments the Assignors and Class Members made for Enrollees. Such payments involved reimbursement of artificially increased quantity of the Subject Pfizer Drugs dispensed at supra-competitive prices.

141.    The Defendants knew and intended that their Scheme would artificially inflate the quantity of dispensed Subject Pfizer Drugs and allow Pfizer to raise the prices of the Subject Pfizer Drugs to supra-competitive levels.

142.    The Assignors and Class Members were the primary and intended victims of Defendants' Scheme and the injury to them was a foreseeable and natural consequence of the Scheme because Pfizer ultimately knew that third-party payers such as the MA Plans and the Medicaid Plans would pay for or reimburse the cost of the Subject Pfizer Drugs.

143.    The Assignors and Class Members suffered direct economic injury as a direct and proximate cause of Defendants' Scheme and are therefore best suited to advance and pursue the recovery of the claims asserted in this Complaint.

144.    Pfizer and PANF had the shared goal of growing Pfizer's co-payment assistance fund and thereby enabling PANF's directors and officers to use the nonprofit charities increased funds to justify a boost in their own compensation. The Co-Payment Circumvention Enterprise increased the number of MA Plan and Medicaid Plan patients (among all healthcare programs) who were receiving co-payment assistance for the Subject Pfizer Drugs from Pfizer's co-payment fund, triggering the Assignors' and Class Members' coverage obligations for their beneficiaries, eliminating price sensitivity to the Subject Pfizer Drugs, and allowing Pfizer to increase its revenues and profits for the Subject Pfizer Drugs.

145.    For Defendants, this collusive bribery Scheme was a "win-win" arrangement. Pfizer ended the free drug program for MA Plan and Medicaid Plan beneficiaries. ACS referred those beneficiaries to PANF to offset their high co-payment costs. Pfizer's "donations" to PANF were used for, *among other things*, executive compensation and co-payment assistance for the Subject Pfizer Drugs. PANF illegally provided data and information to Pfizer about the profitability of Pfizer's donations to PANF. Pfizer's increasing contributions to PANF resulted in more Medicare and Medicaid patients receiving co-payment assistance. This in turn eliminated price sensitivity, resulting in artificially inflated quantities of dispensed Subject Pfizer Drugs at supra-competitive pricing, which together increased profits for Pfizer. And all along the way, as Pfizer's drug prices increased and use of PANF increased to mask the effects of the price increases, "donations" to PANF continued to rise, PANF's executives increased their own compensation and benefits.

146.    Data from CMS and Assignors show how Defendants' Scheme eliminated price sensitivity of patients purchasing, physicians prescribing, and pharmacies dispensing the Subject Pfizer Drugs and resulted in federal healthcare programs bearing the increased costs. Said data reflects that Pfizer charged supra-competitive prices and increased the quantity of the Subject Pfizer Drugs paid for by federal programs while the Co-Payment Circumvention Enterprise was active.

147.    The Assignors paid over **$22.6 million** in claims for the Subject Pfizer Drugs from at least January 1, 2012, to present.

148.    Information in the exclusive control of Defendants will prove that a significant portion of the co-payments paid on behalf of the beneficiaries of the Assignors and Class Members were made by PANF in connection with Defendants' Co-Payment Circumvention Enterprise.

149.    The Assignors and Class Members were not privy to which financially needy patients' co-payments were being provided by Pfizer's bribes to PANF. Assignors' obligations to cover claims for the Subject Pfizer Drugs arose only when covered patients satisfied their co-payment obligations. The Assignors did not, and could not, have known that their reimbursement obligations were caused by Defendants' misconduct.

150.    Defendants' documents and disclosures clearly show that they possess information to show exactly which patients received co-payment assistance. For example: PANF's Form 990 Tax Filings state in Supplemental Information to Schedule I, Part I, Line 2:

> These funds represent grants made for the benefit of patients. Through an application process which includes income attestation with random verification against criteria set by the board, a doctor's attestation to validate the patient medical need and an insurance benefits verification, [PANF] ensures that all patients who request our services meet the criteria for a disease fund before any funds are disbursed. The patient's grant will provide assistance for their responsibility (deductible, co-payment, or coinsurance) for covered medication services after payment from the primary insurance or the amount available to each patient is

limited by a cap set by the board. Funds are disbursed to the pharmacy or physician's office when possible, since we want to ensure that the patient does not need to provide funds out-of-pocket for their medications.[14]

151.    The Assignors' data confirms that the quantity of Subject Pfizer Drugs paid for by the Assignors plummeted after Defendants' Co-Payment Circumvention Enterprise was uncovered. This evidences the causal effect of Defendants' conspiracy and misconduct.

152.    Through their Scheme, Defendants caused innocent, non-party pharmacies to seek reimbursement from federal health care programs for their purchases of the Subject Pfizer Drugs. The act of submitting claims for reimbursement carries with it an implied certification of compliance with governing federal rules that are a precondition of and material to payment.

153.    These non-party pharmacies unknowingly submitted claims for reimbursement with the implication that the claims complied with federal law, including the AKS. Thus, Defendants caused innocent, non-party pharmacies to provide false certifications about the true nature of the Subject Pfizer Drugs being dispensed to the Assignors' and Class Members' beneficiaries.

154.    However, because of Pfizer using PANF as a conduit with data from ACS, they did not act as independent charities and instead acted in violation of the AKS. Therefore, those certifications were false.

155.    The Assignors and Class Members were harmed by (1) paying for an increased number of prescriptions of the Subject Pfizer Drugs throughout the United States as a direct result of the Co-payment Circumvention Enterprise and (2) paying inflated prices for those prescriptions.

---

[14] *See* **Exhibit G** – PANF Form 990 Tax filings.

## X.     CLASS ACTION ALLEGATIONS

156.    At all material times, the Subject Pfizer Drugs were shipped across state lines and sold within and outside of their state of manufacture.

157.    During the relevant period, in connection with the purchase and sale of the Subject Pfizer Drugs, monies as well as contracts, bills, and other forms of business communication and transactions, were transmitted in continuous and uninterrupted flow across state lines.

158.    During the relevant period, various methods of communication were used to carry out the illegal acts alleged here, including the United States mail, interstate, and foreign travel, interstate and foreign telephone commerce, and interstate wire facilities. The activities of Defendants, as alleged in this Complaint, were within the flow of, and have substantially affected, interstate commerce.

159.    Plaintiffs bring this action on behalf of themselves and the following Class Members:

> All Medicare Advantage organizations and first-tier, downstream, and related Medicare entities; and Medicaid Managed Care Organizations and at-risk, first-tier, downstream, and related Medicaid entities in the United States and its territories that bore all or part of the expense to purchase the Subject Pfizer Drugs between January 1, 2012 through December 31, 2016, pursuant to Medicare and/or Medicaid contracts to provide Medicare and/or Medicaid health care benefits. This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) the federal government; and (c) any judges or justices involved in this action and any members of their immediate families.

160.    Plaintiffs bring this action under Federal Rule of Civil Procedure 23 both individually and on behalf of a national damages class.

161.    Defendants' Scheme resulted in supra-competitive prices for, and increased sales quantities of, the Subject Pfizer Drugs, the costs of which were borne by the Assignors and Class Members. The damages suffered by the Assignors apply to all individual Class Members (and Plaintiffs as the rightful assignees of those organizations rights of recovery). Class action law has

long recognized that, when companies engage in conduct that has uniformly harmed many claimants such as Assignors, and other Medicare and Medicaid third-party payers, class resolution is an effective tool to redress the harm.

162.    The Assignors and Class Members were deprived of money as a result of their obligation to pay for prescribed Subject Pfizer Drugs at artificially inflated supra-competitive prices, and because of Defendants improper shifting patients from Pfizer's free drug program to the co-payment charity. But for the Scheme, the Assignors and Class Members would not have paid for certain Enrollees' Subject Pfizer Drugs and would have paid less for those drugs for which they would have needed to purchase.

163.    The Class Members claims are properly brought and should be maintained as a nationwide class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy:

> Numerosity: The Class Members are so numerous that joinder is impracticable. Plaintiffs believe the Class includes thousands of third-party payors that paid for hundreds of thousands, if not millions, of prescriptions. There are thousands of entities (including the organizations that assigned their rights to Plaintiffs) throughout the United States that sustained damages as a result of their payment for the Subject Pfizer Drugs caused by Defendants' Scheme. Thus, the numerosity element for class certification is met.

> Commonality: Defendants' misconduct was directed at all Class Members. Questions of law or fact are common to all Class Members. Defendants' co-payment assistance conspiracy Scheme and racketeering activity carried out by their enterprise have a common, adverse effect on all Class Members. Thus, common questions of law or fact are prevalent throughout the class, such as whether Defendants engaged in a pattern of racketeering activity and conspired to induce Class Members' payment for the Subject Pfizer Drugs prescriptions. Each Class Member shares the same needed remedy—namely reimbursement for unlawfully paid bills and lost money or disgorgement of Defendants' profits as a result of Defendants' co-payment assistance conspiracy Scheme and racketeering activity that caused the Assignors and Class Members to pay supra-competitive prices for artificially inflated quantities of the Subject Pfizer Drugs.

> Typicality: Plaintiffs' claims are typical of the claims of the Class Members because their claims arise from the same course of conduct by Defendants, namely

Defendants' formation of their co-payment Scheme and racketeering activity unlawfully causing Class Members to reimburse innocent, non-party pharmacies for the over-prescription and over-dispensing of the Subject Pfizer Drugs at supra-competitive prices and actual payment that would otherwise not have been made but for Defendants' conduct. Plaintiffs' claims are, therefore, typical of the Class Members.

Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. Plaintiffs' interests in vindicating these claims are shared with all of the Class Members. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action litigation and have particular experience with class action consumer protection and RICO litigation in the pharmaceutical industry.

160.    The Classes are properly brought and should be maintained as a class action under Rule 23(b) because a class action is the superior method for resolving these claims. Under Rule 23(b)(3), common issues of law and fact predominate over any questions affecting only individual members of the Class. Defendants deliberately conspired to cause Assignors to pay for the Subject Pfizer Drugs through the formation of their co-payment Scheme that subsequently resulted in the submission and payment of supra-competitive prices for the Subject Pfizer Drugs by Assignors and the Class Members that otherwise would not have been paid.

161.    The Assignors and Class Members paid for prescriptions of the Subject Pfizer Drugs that they otherwise would not have paid but for Defendants' Co-Payment Circumvention Enterprise and racketeering activity.

162.    Additional questions of law and fact common to some or all of the Class Members include:

    a.    Whether Defendants engaged in a bribery scheme and thereby violated the AKS, the Travel Act, and mail and wire fraud statutes;

    b.    The effect of such bribery scheme on the quantities dispensed and prices of the Subject Pfizer Drugs; and

    c.    The quantum of overcharges paid by the Assignors and Class Members in the aggregate.

163.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

164.     Plaintiffs know of no difficulty to be encountered in this action that would preclude its maintenance as a class action.

## XI.     TOLLING OF THE STATUTE OF LIMITATIONS

### *Fraudulent Concealment Tolling*

165.     The claims asserted in this Complaint have been tolled as a matter of law as Defendants took affirmative steps to conceal the wrongful conduct alleged here including, *inter alia*, Pfizer's use of PANF as a conduit and concealing such use under the guise of "donations" to an "independent" co-payment assistance charity.

### *Discovery Rule Tolling*

166.     Assignors did not know, and no reasonable way of discovering Defendants' Scheme alleged. Within the applicable statutes of limitation, Assignors could not have discovered through the exercise of reasonable diligence that Defendants were engaged in and concealing the conduct complained of. Assignors did not discover, and did not know of, facts that would have caused a reasonable person to suspect that the Defendants were engaged in the alleged Scheme, nor would a reasonable diligent investigation have disclosed the facts.

XII.    **CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**Violation of Racketeering Influenced Organization Corrupt Act ("RICO") 18 U.S.C. §**
**1964(c) Through the Use of the Co-Payment Charity Scheme**

*Against All Defendants*

167.    Plaintiffs re-allege and incorporate by reference paragraphs 1-166 of this Complaint as if fully set forth herein.

168.    At all relevant times, Defendants were "persons" under 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through the pattern of racketeering activity detailed throughout this Complaint in violation of 18 U.S.C. § 1962(c).

169.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

170.    The elements of a RICO claim under § 1964(c) pursuant to a violation of § 1962(c) are: (i) conduct; (ii) of an enterprise; (iii) through a pattern of; (iv) racketeering activity.

*Description of the Co-Payment Circumvention Enterprise*

171.    RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union group or individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

172.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprises' purpose.

173.    The Co-Payment Circumvention Enterprise is an association-in-fact enterprise under 18 U.S.C. § 1961(4), consisting of Defendants Pfizer, ACS, and PANF, including their directors, officers, employees, and agents.

174.    The Co-Payment Circumvention Enterprise functioned as an ongoing and continuing unit. The Co-Payment Circumvention Enterprise was created and used as a tool to carry out a pattern of racketeering activity. Each of the Enterprise participants is a "person" distinct from the Co-Payment Circumvention Enterprise.

175.    The Co-Payment Circumvention Enterprise had a common purpose that united its members. This purpose was to profit from the illegal bribes, kickbacks, and referrals. The common purpose was accomplished by (1) growing PANF's co-payment assistance funds and PANF's executive salaries and (2) by increasing the number of patients who had their drugs bought by Assignors and Class Members, thereby increasing the amount of money Pfizer made from the Subject Pfizer Drugs. By funneling patients into PANF's co-payment assistance funds, the Co-Payment Circumvention Enterprise increased Pfizer's number of covered "customers," thereby triggering the Assignors' and Class Members' coverage obligations for their Enrollees and eliminating price sensitivity to the Subject Pfizer Drugs. This conduct decreased price sensitivity, thus enabling Pfizer to charge supra-competitive prices. These two prongs of the plan worked hand-in-hand, resulting in a cycle that expanded profits for PANF, ACS, and Pfizer, at the expense of, *among other things*, the Assignors and Class Members.

176.    Each of the Defendants received substantial revenue from participating in the Co-Payment Circumvention Enterprise. Such revenue was exponentially greater than it would have been without such Enterprise. Each portion of the Enterprise benefitted as intended from the existence of the other parts.

177.    The Co-Payment Circumvention Enterprise has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between the Defendants.

178.    There were interpersonal relationships between those associated with the Co-Payment Circumvention Enterprise. This includes relationships (1) among PANF's officers and directors and relationships among Pfizer's officers, directors, principals, and agents and ACS' officers, directors, principals and agents; and (2) relationships between PANF, ACS, and Pfizer. This is evidenced by routine communications (through the U.S. Mail and Wire) between Pfizer and PANF to ensure that its "donations" were sufficient to drive increased profits. ACS would facilitate this process by sharing PANF data with Pfizer to ensure that Pfizer's "donations" achieved their proper purpose of paying co-pays for Sutent and Inlyta to increase profits. Pfizer and PANF knew and intended for ACS to facilitate this illegal sharing of information. In fact, PANF settled DOJ charges alleging the exact conduct alleged here, noting that PANF operated not strictly as an independent charity, but as a pass-through for specific pharmaceutical companies, to facilitate the payment of kickbacks, enabling pharmaceutical companies to undermine the Medicare program at the expense of American taxpayers. This conduct and the conduct set forth in the Pfizer settlement shows that PANF, ACS, and Pfizer had a relationship and communicated information important to their Scheme *through the mail and wires* to profit illegally.

179.    The Co-Payment Circumvention Enterprise had longevity sufficient to permit its associates to pursue the enterprise's purpose. Since at least 2012, Pfizer made "donations" to PANF, a purportedly "independent" charity, and PANF continued to increase their executive compensation. ACS increased the number of prescriptions they could fill by ensuring Pfizer had sufficient data from PANF to verify that PANF used Pfizer's "donations" to pay the co-pays of

Sutent and Inlyta patients. Pfizer further insulated the price sensitivity of the Subject Pfizer Drugs. Pfizer's use of anticompetitive and illegal tactics increased the number of "customers" buying the Subject Pfizer Drugs, facilitating increased profits.

180.    Pfizer carried out its business activities both with and without PANF and ACS, including using other co-payment charities. Similarly, PANF operated other funds without Pfizer. The Scheme thus did not involve parallel conduct because the Defendants participate in transactions with co-payment charities that do not result violations of the AKS or the FCA.

Conduct of the Co-Payment Circumvention Enterprise's Affairs

181.    Each Defendant conducted or participated in, either directly or indirectly, the conduct of the Co-Payment Circumvention Enterprise's affairs. Each Defendant was part of the Co-Payment Circumvention Enterprise and each operated and managed the Co-Payment Circumvention Enterprise. Such participation included, but is not limited to: (1) PANF shared data (through the U.S. mail and wire facilities) with ACS, and ACS shared data (through the U.S. mail and wire facilities) with Pfizer so PANF and Pfizer could effectively conduct ROI analyses on the amounts of Pfizer's "donations" to PANF for Sutent and Inlyta co-pays; (2) Pfizer provided necessary bribes, disguised as donations, for the co-payments, thus triggering the payment obligations of Assignors; (3) PANF and Pfizer steered and funneled patients into using Pfizer's co-payment assistance program; and (4) PANF and Pfizer coordinated the establishment of the Tikosyn fund with Tikosyn price increases to direct patients to the program and subsidize their co-payments, thus eliminating price sensitivity and raising the quantity of Tikosyn dispensed.

182.    At all relevant times, each Defendant was aware of the Co-Payment Circumvention Enterprise's conduct and has been a knowing and willing participant in the racketeering conduct of the Enterprise.

*Defendants' Pattern of Racketeering Activity*

183.    To carry out their illegal and collusive bribery Scheme, Defendants knowingly conducted or participated, directly or indirectly, in the affairs of the Co-Payment Circumvention Enterprise through a pattern of racketeering activity under 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c), and employed the use of the mail, wire, and other facilities in interstate commerce, to promote, manage, establish, and carry out the Co-Payment Circumvention Enterprise in violation of 18 U.S.C. § 1952 (Travel Act), § 1341 (mail fraud), and § 1343 (wire fraud).

184.    Defendants' pattern of racketeering involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mail and interstate wire facilities to further the Co-Payment Circumvention Enterprise. Each of these mailings and interstate wire transmissions constitutes an instance of "racketeering activity" under 18 U.S.C. § 1961(1)(B) by violating the underlying predicate acts of § 1952, § 1341, § 1343. Collectively, these violations constitute a "pattern of racketeering activity," under 18 U.S.C. § 1961(5), to advance Defendants' intentional and illegal Scheme.

185.    Defendants engaged in a Scheme to profit at the direct expense of third-party payors, including the Assignors and Class Members. They funneled and steered patients into Pfizer's co-payment assistance program, knowing third-party payors such as the Assignors and Class Members would ultimately bear the cost of the Subject Pfizer Drugs. Defendants knew their Scheme to funnel, steer, and refer were violative of federal and state laws including, but not limited to, the AKS and the FCA and that they were transmitting false and illegal information through mail and wire communications.

186.    Defendants' use of the mails and wires to perpetuate their Co-Payment Circumvention Enterprise involved thousands of communications which involved, among others, the following:

    a.    Communications from Pfizer, ACS, and PANF to patients, steering them to Pfizer's co-payment assistance program using PANF;

    b.    Transmittal of bribes, disguised as donations, by Pfizer to PANF, which were used, in part, to pay the co-payments of Pfizer's "customers" in Pfizer's co-pay assistance program;

    c.    Submissions of data from PANF to ACS, and ACS to Pfizer so that Pfizer could conduct ROI analyses on its "donations" to PANF to forecast the ROI resulting from said "donations" and to see how much more revenue it could generate by increasing its "donations";

    d.    Communications between PANF and Pfizer to ensure that PANF's Tikosyn fund's opening coincided with Tikosyn price increases;

    e.    Certifications by PANF that it would determine eligibility according to a "uniform measure of financial need that is applied in a consistent manner" when in fact PANF emphasized patients taking the Subject Pfizer Drugs based on Pfizer bribes, not financial need;[15] and

    f.    Causing false claims, in violation of the FCA and AKS, to be submitted by innocent, non-party pharmacies to the Assignors and Class Members.

187.    The predicate act violations of the Travel Act, as well as mail and wire fraud, had the same purpose; that is, to make money by growing Pfizer's co-pay assistance program as large as possible so PANF's officers and directors could justify increasing their compensation, ACS could fill as many prescriptions for Sutent and Inlyta as possible, thereby increasing their own profits, and so Pfizer could get as many "customers" for the Subject Pfizer Drugs as possible, at the expense of the Assignors and Class Members. All of the predicate acts detailed above, including the certifications made by Pfizer, ACS, and PANF, as well as the wire communications in furtherance of their Scheme, were for this purpose. If PANF had not falsely certified that they used uniform measures of financial eligibility, and if Pfizer, ACS, and PANF had not deceptively

---

[15] *See* PANF's Form 990 Filings, attached as Exhibit G.

caused innocent, non-party pharmacies to provide bills for payment to third-party payors, the Assignors and Class Members would not have paid artificially inflated prices or for improperly increased quantities of the Subject Pfizer Drugs. Defendants caused innocent, non-party pharmacies to send false bills for payment over the mail and wire so Pfizer could make larger bribes to PANF, ACS could fill more prescriptions, in turn harming the Assignors and Class Members.

188.    These predicate acts perpetuated the Scheme to increase the prices and dispensed quantities of Subject Pfizer Drugs. As a result, the Assignors and Class Members paid the supra-competitive prices for an improperly increased quantity of dispensed Subject Pfizer Drugs.

189.    Pfizer, ACS, and PANF, including their officers, directors, agents, and principals, participated in all of the predicate acts. These individuals sent, or caused to be sent, all of the false certifications through the mail or wire facilities. These individuals communicated with each other, and others, in furtherance of the Scheme.

190.    The Co-Payment Circumvention Enterprise orchestrated by Defendants injured the Assignors and Class Members.

191.    The violations of the Travel Act and mail and wire fraud included transmission of false claims and the unlawful transmission of data and communications to further the racketeering Scheme over a period of at least five years involving harm to multiple parties.

192.    PANF was involved in a similar illegal scheme with other drug manufacturers. PANF accepted bribes from four pharmaceutical companies—Bayer, Astellas, Dendreon, and Amgen—and allowed these companies to use PANF as a conduit. PANF settled these claims with the U.S. Attorney's Office, with PANF agreeing to pay $4 million to resolve the claims. PANF's

and Pfizer's multi-faceted scheme involved multiple victims and predicate acts and is the exact type of broad and persistent racketeering activity that RICO was intended to stop.

193.     The Co-Payment Circumvention Enterprise's illegal Scheme and its predicate acts proximately caused injury to the Assignors' and Class Members' business and property by triggering the Assignors' and Class Members' duty to purchase the Subject Pfizer Drugs and driving up the cost of the Subject Pfizer Drugs. Defendants' predicate acts directly led to the Assignors and Class Members payment for the Subject Pfizer Drugs on behalf of their beneficiaries. The Assignors and Class Members were the direct and intended victims of the Co-payment Circumvention Enterprise.

194.     Accordingly, Defendants' violations of 18 U.S.C. § 1962(c) directly and proximately caused injuries and damages to the Assignors and Class Members. The Assignors and Class Members were harmed by paying an increased price and increased dispensed quantity of the Subject Pfizer Drugs. This harm was the direct, intended, and a foreseeable consequence of Pfizer's payment of bribes to PANF via the Co-Payment Circumvention Enterprise. In fact, as the party who paid for the Subject Pfizer Drugs, the Assignors and Class Members were likely the *only* direct victims of the Co-Payment Circumvention Enterprise—aside from the Government's injuries. Defendants' actions entitle Plaintiffs to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees under 18 U.S.C. § 1964(c).

## SECOND CLAIM FOR RELIEF
### Violation of RICO, 18 U.S.C. § 1964(d) Through the Co-Payment Circumvention Enterprise
*Against All Defendants*

195.     Plaintiffs re-allege and incorporate by reference paragraphs 1-166 of this Complaint as though set forth at length here.

196.    Section 1962(d) makes it unlawful for "any person to conspire to violate" section 1962(c), among other provisions.

197.    Defendants violated § 1962(d) by conspiring to violate § 1962(c). The object of this conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs of the Co-Payment Circumvention Enterprise described previously, through a pattern of racketeering activity.

198.    Pfizer knowingly agreed with PANF and ACS that Pfizer would perform services that would facilitate the illicit activities of the Co-Payment Circumvention Enterprise. Pfizer, through PANF steered patients needing the Pfizer Subject Drugs from Pfizer's free drug program to PANF's co-payment assistance programs. Pfizer also provided PANF with bribes disguised as donations for the charity to subsidize the co-payments of Pfizer's "customers" using the co-payment assistance programs. Pfizer also used data provided by ACS from PANF—data which PANF knowingly and intentionally provided to ACS so that ACS could provide it to Pfizer to advance the Co-Payment Circumvention Enterprise—in violation of the AKS and FCA. The shared data allowed Pfizer to perform ROI analyses on its "donations" to forecast the effect of donations on revenue and profit. Pfizer thus set out a roadmap of illegal activities and profits. Pfizer, ACS, and PANF also caused false certifications to be sent over the interstate mail and wire facilities claiming they were in compliance with federal law, including the AKS and FCA.

199.    Further, PANF knowingly agreed with Pfizer and ACS that they would perform services that would facilitate the activities of the Co-Payment Circumvention Enterprise and those who were running it in an illegal manner. Some of the services that PANF performed were steering people towards their co-payment assistance funds. PANF caused false certifications to be sent over the interstate mail and wire facilities claiming they were in compliance with federal law, including

the AKS and FCA. PANF sent data to ACS with the understanding and intention that ACS would share this data with Pfizer, in violation of the AKS and FCA, so Pfizer could see how much money it was making from its "donations" to PANF, and how much more money it could make by increasing its "donations." Indeed, this conduct shows that Pfizer, ACS, and PANF did not engage in parallel conduct but worked together and had a meeting of the minds that they could each profit from the Co-payment Circumvention Enterprise. PANF knew that if Pfizer provided more "donations," Pfizer would make more money. Thus, by illegally providing data to Pfizer, PANF was soliciting greater contributions.

200.    Further, ACS knowingly agreed with Pfizer and PANF that they would perform services that would facilitate the activities of the Co-Payment Circumvention Enterprise and those who were running it in an illegal manner. Some of the services that ACS performed were steering people towards PANF's co-payment assistance funds by sharing PANF data with Pfizer to ensure Pfizer could verify that its "donations" provided co-pays for the Subject Pfizer Drugs. ACS caused false certifications to be sent over the interstate mail and wire facilities claiming they were in compliance with federal law, including the AKS and FCA. ACS sent Pfizer data, in violation of the AKS and FCA, so that Pfizer could see how much money it was making from its "donations" to PANF, and how much more money it could make by increasing its "donations." Indeed, this conduct shows that Pfizer, ACS, and PANF did not engage in parallel conduct but worked together and had a meeting of the minds that they could each profit from the Co-payment Circumvention Enterprise. ACS knew that if Pfizer provided more "donations," PANF would provide more co-pay assistance, thereby increasing both Pfizer's and ACS's profits by further inflating the prices and dispensed quantities of the Subject Pfizer Drugs. Thus, by illegally providing data to Pfizer, ACS managed to increase its own profits—as well as Pfizer's and PANF's profits.

201.    Pfizer knowingly agreed with PANF and ACS that one or all of them would commit at least two instances of Travel Act violations or mail and wire fraud (or cause an innocent third-party to send false statements over the mails and wires). In short, Pfizer knew that it, ACS, and PANF had to abide by the AKS and FCA, and it knew the Scheme it was engaged in or planned to engage in with ACS and PANF would violate those statutes. Pfizer knew that PANF certified with the OIG that PANF would use a uniform measure of financial need when providing co-pay assistance, when in fact PANF was a mere conduit to provide co-pay assistance for patients taking the Subject Pfizer Drugs. It also knew that each time a pharmacy filled a prescription for someone using PANF's co-pay assistance, any certifications the pharmacist made that he or she would abide by federal law would be false.

202.    PANF knowingly agreed with ACS and Pfizer that one or all of them would commit at least two instances of Travel Act violations or mail and wire fraud (or cause an innocent third-party to send false statements over the mails and wires). In short, PANF knew it, ACS, and Pfizer had to abide by the AKS and FCA, and it knew the Scheme it was engaged in or planned to engage in with Pfizer would violate those statutes. PANF knew that it had certified with the OIG that it would use a uniform measure of financial need when providing co-pay assistance, when in fact PANF was a mere conduit to provide co-pay assistance for patients taking the Subject Pfizer Drugs. It also knew that each time a pharmacy filled a prescription for someone using its co-pay assistance, any certifications the pharmacist made that he or she would abide by federal law would be false.

203.    ACS knowingly agreed with PANF and Pfizer that one or all of them would commit at least two instances Travel Act violations or of mail and wire fraud (or cause an innocent third-party to send false statements over the mails and wires). In short, ACS knew it, PANF, and Pfizer

had to abide by the AKS and FCA, and it knew the Scheme it was engaged in or planned to engage in with Pfizer would violate those statutes. ACS knew that PANF had certified with the OIG that it would use a uniform measure of financial need when providing co-pay assistance, when in fact PANF was a mere conduit to provide co-pay assistance for patients taking the Subject Pfizer Drugs. It also knew that each time a pharmacy filled a prescription for someone using its co-pay assistance, any certifications the pharmacist made that he or she would abide by federal law would be false.

204.    Defendants knew that any communication they had over the telephone, email, or text message in furtherance of the Scheme would be predicate acts.

205.    In short, Pfizer, ACS, and PANF knowingly agreed to pursue the same objective of profiting illegally from the Co-payment Circumvention Enterprise. They agreed to divide the work of accomplishing this objective. Pfizer would make the "donations"; PANF would provide data; ACS would facilitate the data, and they would all steer patients and make false certifications. Each Defendant intended to further this endeavor, which, as described above, when completed, violated 18 U.S.C. § 1962(c) that proximately and directly injured the Assignors and Class Members.

206.    Plaintiffs bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees under 18 U.S.C. § 1964(d).

### THIRD CLAIM FOR RELIEF
### Violations of State Consumer Protection Laws

*Against All Defendants*

207.    Plaintiffs re-allege and incorporate by reference paragraphs 1-166 of this Complaint as if fully set forth herein.

208.    Defendants engaged in unfair, false, unconscionable, or deceptive acts or practices in violation of various state consumer protection laws, as set forth below.

209.   Defendants directly misrepresented to Assignors and Class Members that they were complying with federal and state laws, including laws against bribery, kickbacks, and false claims to the government.

210.   Defendants intended for 'payers such as Assignors and Class Members to rely on these certifications. The intention may be inferred by the very nature of the representation, whose sole purpose was to procure payment for Subject Pfizer Drugs. These representations and certifications were made in an effort by Defendants to have the consuming public use the PANF fund and were addressed to the market generally by having improper and unnecessary prescriptions for Subject Pfizer Drugs paid for by Medicare, the Assignors, and Class Members. The ultimate consequence of this conduct is a significant injury to the consuming public by, among other things, imposing additional costs on the taxpaying public for Medicare.

211.   Assignors and Class Members relied on these misrepresentations to their detriment, which were material to their decision to pay for Subject Pfizer Drugs.

212.   Assignors and Class Members were directly and proximately injured by Defendants' conduct suffered an injury in fact, and suffered actual, ascertainable damages.

213.   Assignors and Class Members would not have reimbursed for nearly as much of the Subject Pfizer Drugs as they did, had Defendants refrained from engineering the false representations or otherwise disclosed its Scheme. Likewise, the Assignors and Class Members would not have paid nearly as much for each prescription of the Subject Pfizer Drugs as they did, had Defendants not eliminated price sensitivity through the Co-payment Circumvention Enterprise.

214.   Accordingly, Plaintiffs and the Class Members in each of the below jurisdictions, seek damages (including statutory damages where applicable), to be trebled or otherwise increased

as permitted by a jurisdiction's consumer protection law, and cost of suit, including reasonable attorneys' fees, to the extent permitted by the below state laws.

### *California Unfair Competition Law (Cal. Bus. Code §§ 17000, et seq.)*

215.    Defendants' conduct occurred in "trade" or "commerce" under Cal. Bus. Code Article 2 §§ 17020-17031.

216.    The California UCL provides that "Any person who engages, has engaged, or proposes to engage in unfair competition shall be liable for a civil penalty." Cal. Bus. Code §17206(a).

217.    Defendants' conduct constitutes "unfair or deceptive" acts in violation of the California UCL.

218.    Defendants' illegal conduct substantially affected California trade and consumers.

219.    Assignors and Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions or misrepresentations, at a minimum, in the form of increased payments for the Subject Pfizer Drugs here.

220.    Defendants' conduct alleged in this Complaint occurred throughout the United States, including the State of California.

221.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Pfizer Drugs in the State of California.

222.    Plaintiffs are entitled to recover their actual damages.

223.    Plaintiffs also seek punitive damages, attorney fees, and any other just and proper relief under the California UCL.

### *Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. §§ 42-110a, et seq.)*

224.     Defendants' conduct occurred in "trade" or "commerce" under Conn. Gen. Stat. § 42-110a(4).

225.     The Connecticut UTPA provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

226.     Defendants' conduct constitutes "unfair or deceptive" acts in violation of the Connecticut UTPA.

227.     Defendants' illegal conduct substantially affected Connecticut commerce and consumers.

228.     Assignors and Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions or misrepresentations, at a minimum, in the form of increased payments for the Subject Pfizer Drugs.

229.     Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of Connecticut.

230.     Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Pfizer Drugs in the State of Connecticut.

231.     Simultaneously with the filing of this Complaint, Plaintiffs served a copy on the Attorney General and Commissioner of Consumer Protection under Conn. Gen. Stat. § 42- 110g.

232.     Plaintiffs are entitled to recover their actual damages, punitive damages, and attorneys' fees under Conn. Gen. Stat. § 42-110g.

**_Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. Ann. §§ 501.201, et seq.)_**

233.     Plaintiffs, Assignors, and Class Members and are "interested persons" and "consumers" under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Fla. Stat. Ann. § 501.203(6)-(7).

234.     Defendants are engaged in "trade or commerce" under Fla. Stat. Ann. § 501.203(8).

235.     FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Fla. Sta. § 501.204(1).

236.     Defendants' conduct constitutes "unconscionable acts or practices, and unfair or deceptive acts or practices" under FDUTPA.

237.     Defendants knew or should have known that their conduct violated FDUTPA.

238.     Defendants' illegal conduct substantially affected Florida commerce and consumers.

239.     Assignors and Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions or misrepresentations, at a minimum, in the form of increased number and size of payments for the Subject Pfizer Drugs.

240.     Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of Florida.

241.     Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Pfizer Drugs in the State of Florida.

242.     Plaintiffs seek to recover against each Defendant the amount of their actual damages, attorneys' fees, and costs under Fla. Stat. Ann. §§ 501.211(2) and 501.2105(1).

### *Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS §§ 505/1, et seq.)*

243.    Defendants' conduct occurred in "trade" or "commerce" under 815 ILCS 505/1(f).

244.    Defendants are "persons" under the Illinois CFDBP Act. 815 ILCS 505/1(c).

245.    Assignors and Class Members are "consumers" under the Illinois CFDBP Act. 815 ILCS 505/1(e).

246.    The Illinois CFDBP Act provides that "Unfair methods of competition and unfair or deceptive acts or practices… are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

247.    Defendants' conduct constitutes "unfair or deceptive" acts or practices in violation of the Illinois CFDBP Act.

248.    Assignors and Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions or misrepresentations, at a minimum, in the form of increased payments for the Subject Pfizer Drugs.

249.    Defendants' conduct alleged in this Complaint occurred throughout the United States, including the State of Illinois.

250.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Pfizer Drugs in the State of Illinois.

251.    Simultaneously with the filing of this Complaint, Plaintiffs served a copy on the Illinois Attorney General under 815 ILCS 505/10a.

252.    Plaintiffs are entitled to recover three times the amount of actual damages resulting from Defendants' violation together with costs and reasonable attorney's fees. 815 ILCS 505/2W.

### *Massachusetts Regulation of Business Practice & Consumer Protection Act (Mass. Gen. Laws Ch. 93a, §§ 1, et seq.)*

253.     Assignors, Class Members, and Defendants are "persons" under the Massachusetts Regulation of Business Practice & Consumer Protection Act ("Massachusetts CPA"). Mass. Gen. Laws Ch. 93A, § 1(a).

254.     Defendants are engaged in "trade or commerce" under Mass. Gen. Laws Ch. 93A, § 1(b).

255.     The Massachusetts CPA makes unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce unlawful. Mass. Gen. Laws Ann. Ch. 93A, § 2(a).

256.     Defendants' conduct constitutes "unfair or deceptive acts or practices" under Massachusetts CPA.

257.     Defendants knew or should have known that their conduct violated Massachusetts CPA.

258.     Defendants' illegal conduct substantially affected Massachusetts commerce and consumers.

259.     Assignors and Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions or misrepresentations, at a minimum, in the form of increased payments for the Subject Pfizer Drugs.

260.     Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of Massachusetts.

261.     Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Pfizer Drugs in the State of Massachusetts.

262.     Plaintiffs seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff. Because Defendants' conduct was committed willfully and knowingly, Plaintiffs are entitled to recover up to three times actual damages, but no less than two times actual damages under Mass. Gen. Laws Ch. 93A, §§ 9 and 11.

263.     Plaintiffs also seek punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts CPA.

### *Michigan Consumer Protection Act (§§ 445.901, et seq.)*

264.     Defendants' conduct occurred in "trade" or "commerce" under Michigan CPA §445.902(g).

265.     Defendants are "persons" under Michigan CPA §445.902(d).

266.     The Michigan CPA provides that "Unfair, unconscionable, or deceptive methods, acts, or practices in conduct of trade or commerce are unlawful." §445.903(1).

267.     Defendants' conduct constitutes "unfair, unconscionable, or deceptive" methods, acts, or practices under the Michigan CPA.

268.     Defendants' conduct substantially affected Michigan trade or commerce, and consumers.

269.     Assignors and Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair, unconscionable, or deceptive practices and omissions or misrepresentations, at a minimum, in the form of increased payments for the Subject Pfizer Drugs.

270.     Defendants' conduct alleged in this Complaint occurred throughout the United States, including the State of Michigan.

271.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Pfizer Drugs in the State of Michigan.

272.    Plaintiffs are entitled to recover their actual damages and reasonable attorney fees under § 445.911(2)-(3).

### *New York General Business Law (N.Y. Gen. Bus. Law §§ 349, et seq.)*

273.    The New York General Business Laws ("New York GBL") makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349.

274.    Defendants' conduct constitutes "deceptive acts" in violation of the New York GBL.

275.    Defendants' illegal conduct substantially affected New York commerce and consumers.

276.    Assignors and Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions or misrepresentations, at a minimum, in the form of increased payments for the Subject Pfizer Drugs.

277.    Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of New York.

278.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Pfizer Drugs in the State of New York.

279.    As a result of the foregoing willful, knowing, and wrongful conduct of Defendants, Plaintiffs have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual damages or $50, whichever is greater, treble

damages up to $1,000, punitive damages to the extent available under the law, reasonable attorneys' fees and costs, an order enjoining Defendants' deceptive and unfair conduct, and all other just and appropriate relief available under N.Y. Gen. Bus. Law § 349.

### *Ohio Consumer Protections Laws (Ohio Rev. Code Ann. §§1345, et seq; §§4165, et seq.)*

280.    Assignors, Class Members, and Defendants are "persons" under the Ohio CPL. Ohio Rev. Code Ann. §1345.01; §4165.01.

281.    Defendants are "suppliers" under Ohio CPL. Ohio Rev. Code Ann. §1345.01

282.    Defendants engaged in trade or commerce under Ohio CPL.

283.    Ohio CPL specifies "No supplier shall commit an unfair or deceptive act or practice." Ohio Rev. Code Ann. §1345.02.

284.    Ohio CPL declares it unlawful for any person to engage in a deceptive practice in the course of the person's business, vocation, or occupation. Ohio Rev. Code Ann. §4165.02.

285.    Defendants' conduct constituted "unfair, deceptive acts or practices" in violation of Ohio CPL.

286.    Defendants knew or should have known that their conduct violated Ohio CPL.

287.    Defendants' illegal conduct substantially affected Ohio commerce and consumers.

288.    Assignors and Class Members relied on Defendants' material misrepresentations about the certifications, their compliance with federal and state laws, including laws against bribery, kickbacks, and false claims to the government.

289.    Assignors and Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions or misrepresentations, at a minimum, in the form of increased payments for the Subject Pfizer Drugs.

290.    Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of Ohio.

291.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Pfizer Drugs in the State of Ohio.

292.    Plaintiffs seek actual economic losses, punitive damages, attorney's fees, and any other just and proper relief available under Ohio CPL.

### *Pennsylvania Unfair Trade and Consumer Protection Law (73 Pa. Cons. Stat. §§ 201-1, et seq.)*

293.    The Assignors, the Class Members, and Defendants are "persons" under the Pennsylvania Unfair Trade and Consumer Protection Law ("Pennsylvania UTPA"). 73 Pa. Cons. Stat. § 201-2(2).

294.    Defendants are engaged in "trade or commerce" under 73 Pa. Cons. Stat. § 201-2(3).

295.    The Pennsylvania UTPA prohibits "unfair or deceptive acts or practices," including "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Cons. Stat. § 201-2(4).

296.    Defendants' conduct constituted "unfair or deceptive acts or practices" in violation of the Pennsylvania UTPA.

297.    Defendants knew or should have known that their conduct violated the Pennsylvania UTPA.

298.    Defendants' illegal conduct substantially affected Pennsylvania commerce and consumers.

299.     Assignors    and    Class    Members    relied    on    the    Defendants'    material misrepresentations about the certifications their compliance with federal and state laws, including laws against bribery, kickbacks, and false claims to the government.

300.     Assignors and Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions or misrepresentations, at a minimum, in the form of increased payments for the Subject Pfizer Drugs.

301.     Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of Pennsylvania.

302.     Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Pfizer Drugs in the State of Pennsylvania.

303.     Plaintiffs seek damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under 73 Pa. Cons. Stat. § 201-9.2(a).

### *Puerto Rico Regulation of Commerce (10 L.P.R.A. §§251, et seq.)*

304.     Assignors, Class Members, and Defendants are "persons" under 10 L.P.R.A. §§ 251, et seq. ("Puerto Rico ROC")

305.     Defendants engaged in trade or commerce under 10 L.P.R.A. §§251, et seq.

306.     The Puerto Rico Regulation of Commerce states, "[u]nfair competition, and unfair or deceptive acts or practices in trade or commerce are hereby decaled unlawful." 10 L.P.R.A. §§251, et seq.

307.     Defendants' conduct constituted "unfair competition, and unfair or deceptive acts or practices" in violation of 10 L.P.R.A. §§251, et seq.

308.   Defendants knew or should have known that their conduct violated the Puerto Rico ROC.

309.   Defendants' illegal conduct substantially affected Puerto Rico commerce and consumers.

310.   Assignors and Class Members relied on the Defendants' material misrepresentations about the certifications their compliance with federal and state laws, including laws against bribery, kickbacks, and false claims to the government.

311.   Assignors and Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions or misrepresentations, at a minimum, in the form of increased payments for the Subject Pfizer Drugs.

312.   Defendants' conduct alleged in this Complaint occurred throughout the United States, including in Puerto Rico.

313.   Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Pfizer Drugs in Puerto Rico.

314.   Plaintiffs seek damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under 10 L.P.R.A. §§251, et seq.

### *South Carolina Unfair Trade Practices Act (S.C. Code Ann. §§ 39-10, et seq.)*

315.   Assignors, Class Members, and Defendants are "person[s]" under the South Carolina Unfair Trade Practices Act ("South Carolina UTPA"). S.C. Code Ann. § 39-5-10(a).

316.   Defendants are engaged in "trade or commerce" as defined by the South Carolina UTPA. S.C. Code Ann. § 39-5-10(b).

317.    The South Carolina UTPA makes unfair or deceptive acts or practices in the conduct of any trade or commerce unlawful. S.C. Code Ann. § 39-5-20.

318.    Defendants' conduct constitutes "unfair or deceptive acts or practices" in violation of the South Carolina UTPA. Defendants knew or should have known that their conduct violated the South Carolina UTPA.

319.    Defendants' illegal conduct substantially affected South Carolina commerce and consumers.

320.    Assignors and Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions or misrepresentations, at a minimum, in the form of increased payments for the Subject Pfizer Drugs.

321.    Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of South Carolina.

322.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Pfizer Drugs in the State of South Carolina.

323.    Because Defendants' unfair and deceptive practices harmed Plaintiffs, Plaintiffs seek recovery of actual damages or $200, whichever is greater, discretionary punitive damages, reasonable attorney's fees and costs, injunctive relief, and all other proper and just relief available under the South Carolina UTPA.

### *Wisconsin Deceptive Trade Practices Act (Wis. Stat. §§ 100.18, et seq.)*

324.    Assignors and Class Members are part of "the public" under the Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA"). Wis. Stat. § 100.18(1).

325.    Assignors and Class Members are "persons" under Wis. Stat. § 100.18(1).

326.     Each Defendant is a "person, firm, corporation or association" under Wis. Stat. § 100.18(1).

327.     The Wisconsin DTPA makes unlawful any "representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1).

328.     Defendants' conduct constitutes "representation[s] or statement[s] of fact which [were] untrue, deceptive or misleading" in violation of the Wisconsin DTPA.

329.     Defendants knew or should have known that their conduct violated the Wisconsin DTPA.

330.     Defendants' illegal conduct substantially affected Wisconsin commerce and consumers.

331.     Assignors and Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions or misrepresentations, at a minimum, in the form of increased payments for the Subject Pfizer Drugs.

332.     Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of Wisconsin.

333.     Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Pfizer Drugs in the State of Wisconsin.

334.     No business relationship, contractual or otherwise, existed or exists between the Assignors, the Class Members, and Defendants.

335.     Plaintiffs seek damages, court costs, and attorneys' fees under Wis. Stat. §100.18(11)(b)(2), and any other just and proper relief available under the Wisconsin DTPA.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment Under State Law**

*Against All Defendants*

336.    Plaintiffs re-allege and incorporate by reference paragraphs 1-166 of this Complaint as though set forth at length herein.

337.    Defendants benefitted from artificially inflated profits on the sale of the Subject Pfizer Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

338.    Defendants' financial benefit resulting from its unlawful and inequitable acts is traceable to overpayments for direct and indirect purchases of the Subject Pfizer Drugs by Assignors and the Class Members.

339.    Assignors and Class Members have conferred upon Defendants an economic benefit — profits from unlawful overcharges and monopoly profits to the economic detriment of the Assignors and Class Members.

340.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of the Subject Pfizer Drugs in each of these States and Territories:

        a.   California;

        b.   Connecticut;

        c.   Florida;

        d.   Illinois;

        e.   Massachusetts;

        f.   Michigan;

        g.   New York;

        h.   Ohio;

        i.   Pennsylvania;

        j.   Puerto Rico;

        k.   South Carolina; and

        l.   Wisconsin.

341.    Defendants' conduct directly resulted in the unjust enrichment of the Defendants through the sale of the Subject Pfizer Drugs in each of the States and Territory mentioned above.

342.    It would be futile for the Assignors and Class Members to seek a remedy from any party with whom they have privity of contract with for its direct or indirect purchases of the Subject Pfizer Drugs.

343.    It would be futile for the Assignors and Class Members to seek to exhaust any remedy against any immediate intermediary in the chain of distribution from which the Assignors and Class Members purchased some of the Subject Pfizer Drugs, as they are not liable and would not compensate the Assignors and Class Members for unlawful conduct caused by Defendants.

344.    The economic benefit of overcharges and artificially inflated quantities of dispensed Subject Pfizer Drugs derived by Defendants through charging supra-competitive and artificially inflated prices for the Subject Pfizer Drugs is a direct and proximate result of Defendants' unlawful conduct.

345.    The economic benefits derived by Defendants rightfully belong to the Assignors and Class Members, as they paid anticompetitive and monopolistic prices beginning in at least 2012 and continuing through the present, and they will continue to do so until the effects of Defendants' illegal conduct cease.

346.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for the Subject Pfizer Drugs derived from Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

347.    Defendants are aware of and appreciates the benefits bestowed on it by the Assignors and Class Members.

348.     Defendants should be compelled to disgorge in a common fund to benefit Plaintiffs all unlawful or inequitable proceeds they received.

349.     A constructive trust should be imposed on all unlawful or inequitable sums received by Defendants traceable to the Assignors and Class Members.

### FIFTH CLAIM FOR RELIEF
### Violations of the Civil Remedies for Criminal Practices Act
### Fla. Stat. 772.101, *et seq.*
*Against All Defendants*

350.     Plaintiffs re-allege and incorporate by references paragraphs 1-166 of this Complaint as if fully set forth herein.

351.     At all times, as set forth above, Defendants' actions were unlawful under Section 772.103(3), Florida Statutes, as they were all "employed by, or associated with, any enterprise through a pattern of criminal activity."

352.     Defendants violated 772.101, *et seq.*, Florida Statutes by participating in or conducting the affairs of the Co-Payment Circumvention Enterprise (as described more fully above) through a pattern of racketeering activity.

353.     The Assignors and the Class Members are "persons" as defined in Section 1.01, Florida Statutes, injured in their business or property, because of Defendants' racketeering violations.

Description of the Co-Payment Circumvention Enterprise

354.     Defendants are "persons" under Section 1.01, Florida Statutes.

355.     Pfizer, ACS, and PANF are members of and constitute an "association in-fact enterprise."

356.     The Co-Payment Circumvention Enterprise is an association-in-fact of individuals and corporate entities under Section 772.101, Florida Statutes, and consists of "persons" associated for a common purpose.

357.     The purpose of the Co-Payment Circumvention Enterprise was to maximize Pfizer's and ACS's profits and PANF's executive compensation.

358.     The Co-Payment Circumvention Enterprise had an ongoing organization with an ascertainable structure and functioned as a continuing unit with separate roles and responsibilities. Pfizer is the source of the alleged Scheme, including providing kickbacks to subsidize payments for the Subject Pfizer Drugs whose co-payments were provided by PANF.

359.     PANF accepted Pfizer's bribes and provided unlawful payments for the Subject Pfizer Drugs. PANF and ACS facilitated and illegally provided grant assistance data to Pfizer.

360.     Pfizer, ACS, and PANF, individually and collectively, fulfilled their roles in the Co-Payment Circumvention Enterprise.

361.     Pfizer, ACS, and PANF were distinct legal entities with distinct purposes. For Pfizer and ACS, the sole purpose was to make as much money off of the Subject Pfizer Drugs as possible. For PANF, it was to raise the amount of money in the funds to justify paying higher salaries to their executives.

362.     The Co-Payment Circumvention Enterprise had an existence that was distinct from the pattern of racketeering in which Pfizer, ACS, and PANF engaged. Pfizer, ACS, and PANF conspired with each other to minimize and conceal the amount of information Assignors and the Class Members received about the claims for payment of the Subject Pfizer Drugs, materially resulting in Assignors' and the Class Members' reimbursement of the purchase price of the Subject Pfizer Drugs that they would not have otherwise paid for. See *Section 817.234*, Florida Statutes

("A person commits insurance fraud punishable as provided in subsection (11) if that person, with the intent to injure, defraud, or deceive any insurer: 1) Presents or causes to be presented any written or oral statement, as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy or a health maintenance organization subscriber or provider contract, knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claims(.)").

363.    At all relevant times, Pfizer, ACS, and PANF operated, controlled, and managed the Co-Payment Circumvention Enterprise. Pfizer, ACS, and PANF failed to disclose a material fact about the existence of the bribes in violation of Section 817.234, Florida Statues, which prohibits causing innocent, non-party pharmacies to submit false submissions of payments to Assignors and the Class Members.

364.    Pfizer, ACS, and PANF's participation in the Co-Payment Circumvention Enterprise was necessary for the successful operation of the Scheme. The members of the Co-Payment Circumvention Enterprise all served a common purpose, which was to increase the fund to an enormous size while knowing each payment was an illegal kickback, funded by bribes from Pfizer, while minimizing the amount of information that Assignors, the Class Members, and the innocent non-party pharmacies, knew about the program. These affirmative acts and strategic omissions were material to Assignors' and the Class Members' decision to issue payment for the Subject Pfizer Drugs. The Co-Payment Circumvention Enterprise's actions maximized the revenue and profitability of the Enterprises' members by knowingly causing payments for the Subject Pfizer Drugs.

365.    Section 772.102, Florida Statutes, provides that criminal activity is any activity chargeable by indictment or information under Florida law, including Section 817.234. Section

817.234 criminalizes situations where health care companies, such as Assignors and the Class Members, are provided incomplete or misleading information about any fact or thing material to a claim for payment. As discussed below, Pfizer, ACS, and PANF have violated Section 817.234, Florida Statutes, by providing incomplete or misleading information material to Assignors' and the Class Members' decision to issue payment for the Subject Pfizer Drugs.

366.     Pfizer, ACS, and PANF committed numerous acts of racketeering by providing incomplete or misleading information related to the Subject Pfizer Drugs. Pfizer, ACS, and PANF knew or had reason to know that they were providing incomplete or misleading information about these claims.

367.     Pfizer, ACS, and PANF knew or had reason to know that they were providing incomplete or misleading information under Section 817.234, Florida Statutes. Despite knowledge of these facts, they induced Assignors and the Class Members to make payment for claims that they otherwise would not have paid. Instead, Pfizer, ACS, and PANF knowingly provide incomplete information to enrich their bottom line.

368.     Based on these omissions, Assignors and the Class Members provided payments for the Subject Pfizer Drugs throughout the United States, including Florida, based on half-truths, inaccurate information, and deliberate omissions. Defendants' omissions were material to the payment of the Subject Pfizer Drugs that the Assignors and Class Members paid for. Had the Assignors and Class Members known of the Co-Payment Circumvention Enterprise, they would not have issued payments for the Subject Pfizer Drugs.

369.     The Assignors and Class Members were the primary and intended victims of Defendants' unlawful Scheme. The Assignors and Class Members paid for the Subject Pfizer

Drugs throughout the United States, including Florida, based on Defendants' omissions of material information under Section 817.234, Florida Statutes.

370.    As part of this Scheme, Defendants caused innocent, non-party pharmacies to submit false certifications and misled Assignors and the Class Members into reimbursing prescriptions of the Subject Pfizer Drugs. Defendants conducted or participated, directly or indirectly, in the Co-Payment Circumvention Enterprise through a pattern of unlawful activity.

371.    By reason of and as a result of Defendants' illegal conduct, the Assignors and Class Members were injured in their business or property.

372.    Defendants' violations directly and proximately caused injuries and damages to the Assignors and Class Members; and Plaintiffs have a right to bring this action for the alleged damages.

373.    Under Section 772.11, Florida Statues, Plaintiffs seek their reasonable attorneys' fees and costs associated with prosecution of this action.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs and the Class Members demand judgment against Defendants as follows:

1.    Awarding Plaintiffs and the Class Members actual, consequential, compensatory, statutory, treble, punitive, and other damages, in an amount to be proven at trial, including pre- and post- judgment interest at the statutory rates;

2.    Awarding Plaintiffs and the Class Members equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

3.      Declaring the alleged acts to be unlawful under the state statutes set forth above, and the common law of unjust enrichment of the states and territories set forth above;

4.      Determining that this action is a proper class action, designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel.

5.      Awarding Plaintiffs and the Class Members their reasonable costs and expenses, including attorneys' fees; and

6.      Awarding such other legal or equitable relief as the Court deems just and proper.

### JURY DEMAND

Plaintiffs and the Class Members demand a jury trial on all claims so triable under Federal Rule of Civil Procedure Rule 38.


Dated: May 20, 2022                    Respectfully submitted,

By: */s/ Shereef H. Akeel*
Shereef H. Akeel (D.C. Bar No. MI0042)
Adam S. Akeel (MI Bar No. 81328)
Sam R. Simkins (MI Bar No. 81210)
Daniel W. Cermak (MI Bar No. 84460)
**AKEEL & VALENTINE, PLC**
888 W. Big Beaver Road 420,
Troy, Michigan 48084
shereef@akeelvalentine.com
adam@akeelvalentine.com (pro hac vice forthcoming)
sam@akeelvalentine.com (pro hac vice forthcoming)
daniel@akeelvalentine.com (pro hac vice forthcoming)

Robert T. Strongarone (D.C. Bar No. 1739534)
John W. Cleary (Fla. Bar No. 118137)
Aida M. Landa (Fla. Bar No. 136451)
**MSP RECOVERY LAW FIRM**
2701 S. LeJeune Road, 10th Floor
Coral Gables, Florida 33134
(305) 614-2222

rstrongarone@msprecoverylawfirm.com
jcleary@msprecoverylawfirm.com (pro hac vice forthcoming)
alanda@msprecoverylawfirm.com (pro hac vice forthcoming)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 20, 2022, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all attorneys of record.

s/ <u>Adam S. Akeel</u>

## APPENDIX

### *Plaintiff MSPRC's Assignment to Demonstrate Standing*

1.      Certain series of MSPRC executed irrevocable assignments of any and all rights to recover payments made on behalf of their Assignors' Enrollees and health plan members. These assignments authorize the designated series, and in turn MSPRC through its LLC Agreement, to pursue and enforce all legal rights of recovery and reimbursement for health care services and benefits. MSPRC alleges the below assignment to demonstrate standing.

2.      On May 12, 2017, **SummaCare, Inc. ("SMCR")** irrevocably assigned to MSP Recovery, LLC all its rights to recover against any liable third party (including Defendants) for payments made on behalf of its Enrollees ("SMCR Assignment"). Specifically, the SMCR Assignment states the following:

> [SMCR] hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [SMCR]'s right, title, ownership and interests in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for [SMCR] that [SMCR] had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to [SMCR] arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims[.]"

3.      On June 12, 2017, MSP Recovery, LLC irrevocably assigned all rights acquired under the SMCR Assignment to Series 16-11-509, a designated series of MSPRC ("Series 16-11-509 Assignment"):

> Assignor … irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the [Assigned Claims] (and all proceeds and products thereof) as such terms are defined in the [SMCR Assignment.]

4.      SummaCare, Inc. consented to, acknowledged, approved, and ratified the Series

16-11-509 Assignment, which is memorialized in a letter dated September 5, 2018.

5.        Consideration was given between each party in executing the SMCR Assignment and the Series 16-11-509 Assignment.

### *Plaintiff MSPA's Assignment Demonstrating Standing*

1.        MSPA was irrevocably assigned any and all rights to recover payments made on behalf of its Assignors' Enrollees and health plan members. These assignments authorize MSPA to pursue and enforce all legal rights of recovery and reimbursement for health care services and benefits. MSPA alleges the below assignment to demonstrate standing.

2.        On December 16, 2014, **Interamerican Medical Center Group, LLC ("IMC")** irrevocably assigned to MSP Recovery, LLC all of its rights to recover against any liable third party (including Defendants) for payments made on behalf of its Enrollees ("IMC Assignment"). Specifically, the IMC Assignment, states the following:

> By way of this Agreement, [IMC] appoints, directs, and, otherwise, irrevocably assigns all of [IMC's] rights as it pertains to the rights pursuant to any plan, State or Federal statute(s) whatsoever directly and/or indirectly for any of its members and/or plan participants, and/or rights pursuant to any agreement[.]

3.        On February 20, 2015, MSP Recovery, LLC irrevocably assigned all rights acquired under the IMC Assignment to MSPA ("MSPA Assignment 3"):

> Assignor hereby irrevocably assigns, transfers, conveys, sets over, and delivers to Assignee or its assigns any and all of Assignor's right, title, ownership and interest in and all rights and entitlements, that Assignor has, may have had, or has asserted against third parties from or relating to the Claims [assigned pursuant to the IMC Assignment].

4.        IMC consented to, acknowledged, approved, and ratified the MSPA Assignment 3.

5.        Consideration was given between each party in executing the IMC Assignment and the MSPA Assignment.

### _Plaintiff MAO-MSO's Assignment Demonstrating Standing_

1.      MAO-MSO has been irrevocably assigned any and all rights to recover payments made on behalf of its Assignors' Enrollees and health plan members. These assignments authorize MAO-MSO to pursue and enforce all legal rights of recovery and reimbursement for health care services and benefits. MAO-MSO alleges the below assignment to demonstrate standing.

2.      On May 3, 2016, **Preferred Medical Plan, Inc.** ("PMPI"), irrevocably assigned all its rights and claims to recover against any liable third party (including Defendants) for payments made on behalf of its Enrollees to MSP Recovery, LLC ("PMPI Assignment"). Specifically, the PMPI Assignment states:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recovery monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assignees Claims", as also specified in Section 1.1. The transfer, grant, right, or assignment of any and all of Client's right, title, ownership, interest and entitlements in and to the Assigned Claims shall remain the confidential and exclusive property of MSP Recovery or its assigns. The Assignment is intended to encompass and does hereby relate to any irrecoverable assignment in law and/or in equity. The Assignment shall be complete and irrevocable.

3.      On August 8, 2016, MSP Recovery, LLC entered into an assignment agreement with MAO-MSO Recovery II LLC, Series PMPI, a segregated series of MSP Recovery Delaware LLC, whereby it irrevocably assigned its right to recover payments pursuant to state and federal as previously assigned from PMPI. Specifically, Section 1.1 of the agreement states that:

> [a]ssignor hereby irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, all of Assignor's right, title, ownership and interest in and to all Assigned Claims, plus all proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether

based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the Assigned Claims, and all rights and claims against primary payers and/or third parties that may be liable to Assignor arising from or relating to the Assigned Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims".

4.      Consideration was given between each party in executing these assignment agreements.

### *Plaintiff Series 44's Assignment Demonstrating Standing*

1.      Certain series of Series 44 executed irrevocable assignments of any and all rights to recover payments made on behalf of their Assignors' Enrollees and health plan members. These assignments authorize the designated series, and in turn Series 44 through its LLC Operating Agreement, to pursue and enforce all legal rights of recovery and reimbursement for health care services and benefits. Series 44 alleges the assignments below to demonstrate standing.

2.      Effective April 28, 2016, **Health First Health Plans, Inc. ("HFAP")** irrevocably assigned to MSP Recovery, LLC all rights under the to recover against any liable third party (including Defendants) for payments made on behalf of its Enrollees ("HFAP Assignment"). The HFAP Assignment expressly provides in pertinent part:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims".
> …
> The transfer, grant, right, or assignment of any and all of Client's right, title, ownership, interest and entitlements in and to the Assigned Claims shall remain the confidential and exclusive property of MSP Recovery or its assigns. This

assignment is irrevocable and absolute.

3.      Effective June 12, 2017, MSP Recovery, LLC assigned all rights acquired under the HFAP Assignment to Series 16-05-456, a designated series of MSPRC ("Series 16-05-456 Assignment). The Series 16-05-456 Assignment states:

> [T]he undersigned Assignor … irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the Claims and Assigned Claims, (and all proceeds and products thereof, including any related assigned assets and assigned documents) as such terms are defined or contained in that certain (1) Assignment and (2) Addendum to the Recovery Agreement and Assignment Addendum, both given and effective April 28, 2016 and executed on June 1, 2018, by and between Health First Health Plans, Inc., a Florida corporation and Medicare Advantage Organization and party to contract number H1099 with The Centers for Medicare & Medicaid Services, as the "Client" and health plan assignor, and [MSP Recovery], a Florida limited liability company (the "Assignment"); irrespective of when the claims were vested in Client, inclusive of any and all claim(s), causes of actions, proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party pursuant to the Assignment from the Client, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims and all information relating thereto.

4.      On October 22, 2020, Series 16-05-456 irrevocably assigned all the rights it acquired from MSP Recovery, LLC to Series 44-20-456, a designated series of Series 44 ("Series 44-20-456 Assignment):

> Assignor . . . hereby irrevocably assigns, transfers, conveys, sets over, and delivers to [Series 44-20-456] and its successors and assigns, (i) any and all of Assignor's right, title, ownership, and interest in and to the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively the "Assigned Claims") as such terms are defined in the Agreements.

5.      Consideration was given between each in executing the HFAP Assignment, the Series 16-05-456 Assignment, and the Series 44-20-456 Assignment.

### *Plaintiff Claims PROV's Assignment Demonstrating Standing*

1.      Certain series of Claims PROV executed irrevocable assignments of any and all rights to recover payments made on behalf of their Assignors' Enrollees and health plan members. These assignments authorize the designated series, and in turn Claims PROV through its LLC Operating Agreement, to pursue and enforce all legal rights of recovery and reimbursement for health care services and benefits. Claims PROV alleges the assignments below to demonstrate standing.

2.      On May 24, 2021, **Centro de Pediatria y Medicina de Familia de Villalba, C.S.P.** ("CPMF") irrevocably assigned all its rights and claims to recovery against any liable entity (including defendants) for payments made on behalf of its Enrollees pursuant to its Government Healthcare Program to Series 21-04-1561, a designated series of Plaintiff Series Prov ("CPMF Assignment"). Specifically, the CPMF Assignment, states the following:

> Assignor irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all of Assignor's Claims arising from and related to the Claims Data transferred, provided or sent to MSP Recovery, these Claims encompassing the "**Assigned Claims**."
>
> Such assignment of the Assigned Claims is irrevocable and absolute, and is broad with respect to recovery efforts and is not limited to any particular recovery strategy regarding reimbursement or recovery efforts.
>
> CPMF Assignment, at 1.1.1, 1.1.2.

3.      Consideration was given between the parties in executing this assignment.