UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MSP RECOVERY CLAIMS, SERIES LLC, *et al.*,

    *Plaintiffs*,

    v.

PFIZER, INC., *et al.*,

    *Defendants*.

No. 22-cv-01419 (DLF)

**MEMORANDUM OPINION**

Five limited liability corporations—MSP Recovery Claims, Series LLC; MSP Recovery Claims PROV, Series LLC; MSPA Claims I, LLC; MAO-MSO Recovery II, LLC, Series PMPI; and MSP Recovery Claims Series 44, LLC—bring this action against Pfizer, Inc., Advanced Care Scripts, and the Patient Access Network Foundation. Before the Court are the defendants' motions to dismiss, Dkts. 47, 49, and 50, and Pfizer's motion to strike, Dkt. 47. For the reasons that follow, the Court will grant the defendants' motions to dismiss and deny as moot Pfizer's motion to strike.

**I.   BACKGROUND**

Under the Medicare and Medicaid systems, beneficiary patients may receive their healthcare benefits, including drugs, from private insurers that contract with the government to provide healthcare insurance to patients. Compl. ¶¶ 42, 44, 48.[1] These insurers cover most of a

---

[1] On a motion to dismiss, the Court assumes the truth of material factual allegations in the complaint. *See Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011). For purposes of this opinion, the Court accepts all of the allegations of the complaint, including those derived from any settlement agreement between the defendants and the government. The Court will not address the defendants' argument that a plaintiff may not "recast" the allegations in a settlement

drug's cost, but patients may still be required to pay a portion of the cost, called a co-payment. *Id.* ¶ 2 n.5. Thus, even when insured by private entities, some patients struggle to pay for their medications. *Id.* ¶ 49. To cover their co-payments, patients can receive financial aid from independent charity patient assistance programs that are funded by donations from pharmaceutical companies. *Id.* ¶¶ 50–51. The Patient Access Network Foundation is one such financial assistance program. *Id.* ¶ 50. It has received money from, among others, Pfizer, *id.* ¶¶ 3, 13, 28, and, at the same time, it has helped patients pay for drugs manufactured by Pfizer—Sutent and Inlyta, both of which treat renal cell carcinoma, and Tikosyn, which treats arrhythmia (collectively, "Subject Drugs). *Id.* ¶¶ 1, 3–4.

The plaintiffs allege that these co-payment assistance schemes create perverse incentives for drug manufacturers because patients end up purchasing drugs that they otherwise could not afford. Although drug manufacturers pay the cost of patients' co-payments (through financial assistance programs), they receive the remaining cost of the drug from the patient's insurer—in this context, a private insurer contracting with Medicare or Medicaid. *Id.* ¶¶ 52–53. Because patients who receive a drug in this manner are not concerned about the total cost of the drug, drug manufacturers are also able to charge more for the drug without losing business. *Id.* ¶¶ 12, 59, 61. Drug manufacturers prefer to make donations to patient assistance programs rather than participate in drug donation programs where they receive no payments for their drugs; by participating in patient assistance programs, they can not only boost sales, but also increase the prices of their drugs. *Id.* ¶¶ 50, 52.

---

agreement to state a claim, *see, e.g.,* Pfizer Mem. at 10–14, Dkt. 47-1, because the Court will resolve the motions on standing grounds.

Such incentives also create room for improper collusion between manufacturers and assistance programs. *Id.* ¶¶ 65–69. As the complaint alleges, a manufacturer can donate to an assistance program to induce the program to "steer patients toward and lock them into [that] manufacturer's product, even when other equally effective and less costly alternatives are available." *Id.* ¶ 61. And an assistance program might, in turn, "influence the patient to purchase . . . certain items," such as drugs made by manufacturers donating to the program, so that the program receives more donations. *Id.* ¶ 63. The Office of the Inspector General has stated that such behavior would be illegal because it would violate the Anti-Kickback Statute, among other laws. *Id.*

The plaintiffs are companies that allegedly have been assigned the right to recover on behalf of Medicare and Medicaid private insurers who were injured by such illegal behavior ("Insurers"). *Id.* ¶ 14. According to the plaintiffs, the three defendants— Pfizer, the Patient Access Network Foundation, and Advanced Care Scripts, a specialty pharmacy—engaged in a "conspiratorial scheme to increase the unit price and quantity dispensed" of the Subject Drugs from January 1, 2012 through December 31, 2016. *Id.* ¶¶ 1, 102, 106–08. Allegedly, during that time period, Advanced Care Scripts "funneled patients away from Pfizer's free drug program" into the Patient Access Network Foundation's copayment assistance program. *Id.* ¶ 5. Pfizer donated money to the Foundation, *id.* ¶¶ 3–5, 115–121, and in exchange, the Foundation covered these patients' co-pays for prescriptions of the Subject Drugs, *id.* ¶ 3. As a result, Pfizer stopped donating its drugs to these patients for free, and instead received large payments from the patients' private Medicare and Medicaid insurers for providing the same drugs to the same patients. *Id.* ¶ 102, 144–145. In addition, to help Pfizer "ensure that [the Foundation] did in fact use [its] . . . 'donations' to pay the co-pays for patients' prescriptions" of the Subject Drugs, Advanced Care

3

Scripts shared the Foundation's data with Pfizer. *Id.* ¶ 3. For the drug Tikosyn in particular, Pfizer also conspired with the Foundation "to create and finance a fund [specifically] for Medicare patients" eligible to be prescribed Tikosyn. *Id.* ¶ 4. They coordinated the timing of the opening of this foundation with a Tikosyn price increase so that the Foundation's co-pay assistance could reduce the price sensitivity of Tikosyn patients and permit them to continue purchasing the drug despite the price increase. *Id.* ¶ 102.

The plaintiffs allege that, "as a result of [this] illegal [s]cheme," the Insurers were forced to pay for artificially increased amounts of the Subject Drugs at supra-competitive prices. *Id.* ¶¶ 70, 80, 88, 99. Namely, they "were harmed as a result of [the] illegal conduct in the approximate sum of $20,853,617 between 2012 and 2021." *Id.* ¶ 40. As evidence that the defendants' conduct caused the Insurers financial injury, the plaintiffs cite "a continuous significant increase in the annual dosage units for Tikosyn" until 2016. *Id.* ¶ 71. Similarly, they allege that usage of Inlyta "went down when the Scheme ended": "Total units provided fell by over 100,000 from 2015 to 2016, in the final year of the Scheme[.]" *Id.* ¶ 86.

On May 20, 2022, the plaintiffs filed this complaint alleging claims under the federal Racketeer Influenced and Corrupt Organizations Act, *id.* ¶¶ 167–206; various state consumer protection laws, *id.* ¶¶ 207–335; unjust enrichment under state law, *id.* ¶¶ 336–349; and a Florida statute, *id.* ¶¶ 350–373. The plaintiffs bring this action on behalf of themselves and a proposed class consisting of all private insurers "that bore all or part of the expense to purchase the Subject Pfizer Drugs between January 1, 2012 through December 31, 2016, pursuant to Medicare and/or Medicaid contracts." *Id.* ¶ 159. Each of the three defendants has filed a motion to dismiss for, among other things, lack of standing, Dkts. 47, 49, 50, and Pfizer has filed a motion to strike references to its settlement with the Department of Justice, Dkt. 47.

## II. LEGAL STANDARD

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss an action for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Federal law empowers federal district courts to hear only certain kinds of cases, and it is "presumed that a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). When deciding a Rule 12(b)(1) motion, the court must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged, and upon such facts determine [the] jurisdictional questions." *Am. Nat'l Ins.*, 642 F.3d at 1139 (citations and internal quotation marks omitted). But the court "may undertake an independent investigation" that examines "facts developed in the record beyond the complaint" in order to "assure itself of its own subject matter jurisdiction." *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005) (internal quotation marks omitted). And the court "do[es] not assume the truth of legal conclusions, nor do[es] [it] accept inferences that are unsupported by the facts set out in the complaint." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (cleaned up). A court that lacks jurisdiction must dismiss the action. Fed. R. Civ. P. 12(b)(1), 12(h)(3).

Rule 12(f) of the Federal Rules of Civil Procedure allows a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). It is a "drastic remed[y] that courts disfavor." *Riddick v. Holland*, 134 F. Supp. 3d 281, 285 (D.D.C. 2015) (citation omitted). But the decision whether to strike ultimately lies with the district court's discretion. *See Bey v. Wash. Metro. Area Transit Auth.*, 341 F. Supp. 3d 1, 11 (D.D.C. 2018).

### III.     ANALYSIS

On a motion to dismiss, "the plaintiff[s] bear[] the burden of establishing by a preponderance of the evidence that the court has subject matter jurisdiction." *Freedom Watch, Inc. v. McAleenan*, 442 F. Supp. 3d 180, 185 (D.D.C. 2020). To establish standing, the plaintiffs "must state a plausible claim that [they have] suffered an injury in fact fairly traceable to the actions of the defendant[s] that is likely to be redressed by a favorable decision on the merits." *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015). Here, the plaintiffs do not allege that they themselves suffered any injury; rather, they assert standing as assignees of the injuries suffered by the Insurers. *See* Compl. ¶ 39. In general, "the assignee of a claim has standing to assert the injury in fact suffered by the assignor." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 286 (2008) (citation omitted). But an assignee-plaintiff must show both that "(1) its ultimate assignor . . . suffered an injury-in-fact, and (2) [the assignor's] claim arising from that injury was validly assigned to [the plaintiff]." *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019).

In the complaint, the plaintiffs allege that the Insurers suffered injuries when they made payments for "the cost of the Subject Pfizer Drugs at supra-competitive prices and . . . for artificially inflated quantities . . . as a result of [the] [d]efendants' Scheme." Compl. ¶ 39. According to the plaintiffs, this "Scheme" began at the latest in 2012, *see id.* ¶¶ 71, 104 n.9, with its "final year" in 2016,[2] *id.* ¶ 86. Similarly, the plaintiffs' proposed class definition encompasses only insurers who "bore all or part of the expense to purchase the Subject Pfizer Drugs between

---

[2] In their opposition briefs, the plaintiffs appear to amend their theory of liability to include "ongoing" illegal conduct past 2016. Pl.'s Opp. to Foundation's Mot. at 37, Dkt. 53; *see also* Pl.'s Opp. to Pfizer's Mot. at 13 n.37, Dkt. 52. But "it is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." *Statewide Bonding, Inc. v. U.S. Dep't of Homeland Sec.*, 980 F.3d 109, 117 n.5 (D.C. Cir. 2020) (cleaned up).

January 1, 2012 through December 31, 2016." *Id.* ¶ 159. As evidence that the illegal scheme existed from 2012 until 2016, the plaintiffs point out that the prices and amount prescribed of the Subject Drugs dropped after 2016. *See id.* ¶¶ 70–72, 86, 151. Thus, according to the plaintiffs' theory of standing, the Insurers' payments for inflated Subject Drugs issued between 2012 and 2016 constitute injuries that are traceable to the illegal scheme the defendants engaged in during that same time period.

Even assuming these allegations suffice to show injury in fact,[3] the assignee-plaintiffs lack standing because they have not shown that they were "validly assigned" any Insurers' "claim arising from that injury." *MSPA Claims*, 918 F.3d at 1318. In an attempt to satisfy this second prong, the plaintiffs offer five "representative" sample assignments, one for each plaintiff. Compl. ¶ 39, app. For each, an entity appears to have assigned some of its rights to sue to a plaintiff.[4] *Id.* app. But the plaintiffs make no attempt to connect these alleged assignments to the injuries in fact.

---

[3] In *MSP Recovery Claims, Series LLC v. Lundbeck LLC*, No. 22-cv-422, 2023 WL 2637383 (E.D. Va. Mar. 24, 2023), a court concluded in a similar case involving the plaintiffs that they had established standing, *id.* at *8. But in that case, the defendants did not argue—and the court did not consider—whether the plaintiffs had sufficiently alleged that they were validly assigned any injuries in fact. *See id.* at *7–*8. The court analyzed only whether the plaintiffs had sufficiently alleged that the "Assignors suffered an injury in fact." *Id.* at *7.

Here, in contrast, the Court has assumed that the Insurers suffered an injury in fact. Even so, the plaintiffs have not satisfied the second requirement for assignee standing.

[4] For purposes of this motion only, the Court assumes that the plaintiffs can bring actions on behalf of their series LLCs, so that assignments made to their series LLCs function as assignments to the plaintiffs. *But see* Pfizer Mem. at 17–18; *MSP Recovery Claims, Series LLC v. Hartford Fin. Servs. Grp., Inc.*, No. 20-cv-305, 2022 WL 3585782, at *6 (D. Conn. Aug. 22, 2022). The Court also assumes that all of the assigning Insurers were Medicare Advantage Organizations, first-tier, or downstream entities that could validly assign the causes of action alleged in the complaint. *But see* Foundation Mem. at 11, Dkt. 50-1.

In other words, there are no factual assertions that show that the representative assigned claims include overpayments for Subject Drugs that occurred between 2012 and 2016.[5]

For example, three of the plaintiffs—MSP Recovery Claims Series 44, LLC; MAO-MSO Recovery II, LLC, Series PMPI; and MSP Recovery Claims, Series LLC—were assigned "all [c]laims existing on the date hereof" (respectively, April 28, 2016; May 3, 2016; and May 12, 2017). Compl. app. 80, 82–84. But the complaint does not allege that, as of these dates, the assignors possessed any claims that were based on inflated payments for Subject Drugs during the relevant time period. At most, the plaintiffs have alleged that that "[t]he [Insurers] [collectively] paid over $22.6 million in claims for the Subject Pfizer Drugs from at least January 1, 2012, to present," *id.* ¶ 147, and an "approximate sum of $20,853,617 between 2012 and 2021," *id.* ¶ 40. Based on these general allegations, however, it is at best speculative that any of the three assigning Insurers made a payment that is traceable to the defendants' illegal conduct *before* the date of the respective assignments. The assignment to MSPA Claims I, LLC, which appears to assign all rights starting on December 16, 2014, *id.* at 81, fares no better because any injury suffered by the assignor may have occurred before the assignment. Finally, MSP Recovery Claims PROV, Series LLC was assigned all "Claims arising from and related to the Claims Data transferred, provided[,]

---

[5] Relatedly, even assuming that the plaintiffs have shown that the five representative Insurers suffered injuries in fact, it is doubtful whether they have shown by a preponderance of the evidence that any of these injuries were *traceable to the defendants' illegal conduct*. Although the plaintiffs allege that the Insurers paid over $20 million for the Subject Drugs between 2012 and *2021*, *id.* ¶¶ 47, 147, they do not allege that any of those payments were made for prescriptions between 2012 and 2016. Instead, they simply assert, in a conclusory fashion, that they made inflated payments over some unspecified time period "as a result of the illegal Scheme." *Id.* ¶¶ 80, 88, 99. Conclusory and speculative assertions are, on their own, insufficient to show that inflated payments are traceable to the alleged unlawful conduct. *See MSP Recovery Claims, Series LLC v. AIG Prop. Cas. Co.*, No. 20-cv-2102, 2021 WL 1164091, at *7 (S.D.N.Y. Mar. 26, 2021) (no standing where "the Court ha[d] no way to assess the likely overlap between the claims reported . . . and medical expenses [actually] incurred" by the assignors (citing *Amidax Trading Grp. v. SWIFT SCRL*, 617 F.3d 140, 143 (2d Cir. 2011))).

or sent to MSP Recovery" as of May 24, 2021. *Id.* at 85. The complaint includes no factual assertions that explain what "Claims Data" is, much less any assertions that establish that the "Claims Data" encompassed claims for the Subject Drugs during the relevant time period. Thus, based on the allegations in the complaint (and even considering the exhibits attached to the plaintiffs' opposition briefs, *see* Dkts. 52, 53, 54), the Court cannot conclude that the plaintiffs were assigned claims arising out of injuries that were related to the defendants' alleged unlawful scheme.

To be sure, at this early stage, the plaintiffs need not identify any specific claims that were assigned, or provide an entire history of assignments corresponding to any particular assignor. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015) ("General factual allegations of injury resulting from the defendant's conduct may suffice" because the Court "presume[s] that general allegations embrace those specific facts that are necessary to support the claim." (citation omitted)). But the Court cannot "accept inferences that are unsupported by the facts set out in the complaint." *Arpaio*, 797 F.3d at 19. Nor does it "assume the truth of legal conclusions." *Id.* Because the Court cannot determine that the plaintiffs were assigned valid claims unless it draws a series of unsupported inferences from the factual allegations of the complaint, the Court will grant the defendants' motions to dismiss the complaint for lack of standing. *See MSP Recovery Claims, Series LLC v. Endurance Am. Ins. Co.*, No. 20-23219, 2021 WL 706225, at *3 (S.D. Fla. Feb. 23, 2021) (no standing because plaintiff "provided no factual assertions . . . to show that A.A.'s claim was part of the assignment between Avmed, Inc. and the Plaintiff"); *MSP Recovery Claims, Series LLC v. Merchants Mut. Ins. Co.*, No. 19-cv-524, 2020 WL 8675835, at *10, *12 (W.D.N.Y. Nov. 20, 2020), *report and recommendation adopted by* 2021 WL 784537 (Mar. 1, 2021) (no standing because none of plaintiff's factual allegations

permitted Court to "determine whether plaintiffs' claims related to the exemplar beneficiaries fall within the assigned claims").

Pfizer also asks that the Court strike allegations in the complaint derived from any settlement agreements. *See* Pfizer Mem. at 15. Because the Court will dismiss the complaint for lack of standing, it will deny Pfizer's motion to strike as moot. *See Cherokee Nation v. U.S. Dep't of the Interior*, No. 20-cv-2167, 2022 WL 17177622, at *20 (D.D.C. Nov. 23, 2022) (denying motion to strike where moving party was already provided with "the main underlying relief they seek in moving to strike").

## CONCLUSION

For the foregoing reasons, the Court grants the defendants' motions to dismiss, denies Pfizer's motion to strike, and dismisses the complaint without prejudice. A separate order consistent with this decision accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

April 4, 2023