## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MSP RECOVERY CLAIMS, SERIES LLC *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 22-cv-1419 (DLF) |
| PFIZER, INC. *et al.*, | |
| *Defendants*. | |

### MEMORANDUM OPINION

Five limited liability companies—MSP Recovery Claims, Series LLC; MSP Recovery Claims PROV, Series LLC; MSPA Claims I, LLC; MAO-MSO Recovery II, LLC, Series PMPI; and MSP Recovery Claims Series 44, LLC—bring this action against Pfizer, Inc., Advanced Care Scripts, and the Patient Access Network Foundation for allegedly conspiring to increase the price and sales volume of three prescription drugs.  Amend. Compl. ¶ 1, Dkt. 77. Before the Court are the defendants' motions to dismiss and to strike.  Dkts. 82, 83, 84.  For the reasons that follow, the Court will grant the motions to dismiss and deny the motions to strike as moot.

## I.     BACKGROUND

### A.      Statutory & Policy Background

The federal Medicare Act offers health insurance to the elderly and disabled.[1]  *See, e.g.*, *Fischer v. United States*, 529 U.S. 667, 671 (2000).  Part C of the Act allows eligible patients to

---

[1] Consistent with the applicable legal standard, what follows assumes the truth of all material factual allegations in the plaintiffs' Amended Complaint.  *See Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).  The relevant facts have not substantially changed since the Court's prior decision in *MSP Recovery Claims, Series LLC v. Pfizer, Inc.*, No. 22-cv-1419, 2023 WL 2770432 (Apr. 4, 2023) ("*MSP I*").

receive healthcare benefits from private insurers.  42 U.S.C. §§ 1395w-21 *et seq.*; *see Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1809 (2019).  Part D of the Act provides for private insurance plans that cover certain patients' prescription drugs.  42 U.S.C. §§ 1395w-101 *et seq*.  Patients, doctors, and others often refer to private insurance plans offered under Part C of the Medicare Act as "Medicare Advantage" Plans.  Amend. Compl. ¶ 78.

Although Medicare Advantage and Medicare Part D plans can cover prescription drugs, they often require copayments.  *Id.* ¶ 3 n.6.  By requiring patients to cover part of their own healthcare costs, copayments discourage overconsumption of healthcare.  *Id.*  But they also mean that some patients with insurance cannot afford drugs they need.  *Id.* ¶ 93.  Enter "Patient Assistance Programs" ("PAPs"), charities that help patients access prescription drugs.  *Id.* ¶ 94.  Sometimes, pharmaceutical companies donate drugs directly to PAPs they create, which in turn distribute the drugs to patients.  *Id.*  In other cases, companies donate money to PAPs, which channel the money to patients, who use it to pay their copayments.  *Id.* ¶ 95.

PAPs can be legitimate, but they are also subject to fraud and abuse.  Abusive PAPs can "steer patients toward and lock them into a particular [drug] manufacturer's product, even when other equally effective and less costly alternatives are available."  *Id.* ¶ 105 (cleaned up).  In addition, when a PAP subsidizes specific drugs, the subsidies "eliminat[e]" or limit the "price sensitivity" created by the copayment system—in other words, they encourage patients to purchase drugs they might not have bought otherwise.  *Id.* ¶ 37.  That, in turn, increases the volume of drugs sold and/or the price that a drug's manufacturer can charge per drug dose, with insurers and the Medicare program footing the bill.  *Id.* ¶¶ 4, 30, 288–89.

---

In accordance with the Court's approach in *MSP I*, the Court "will not address the defendants' argument that [the plaintiffs] may not 'recast' the allegations in a settlement agreement to state a claim," as the Court will resolve this case on other grounds.  *Id.* at *1 n.1.

B.      **Factual Background**

This case alleges abusive use of a PAP.  Pfizer sells three prescription medications: Sutent and Inlyta, which "treat renal cell carcinoma," and Tikosyn, which "treats arrhythmia in patients with atrial fibrillation or atrial flutter."  *Id.* ¶ 1.  The Patient Access Network Foundation ("PANF") is a PAP.  *Id.* ¶ 56.  According to the First Amended Complaint, from 2009 and onwards, Pfizer "conspired with PANF to create and finance a fund for Medicare patients being treated for arrythmia with atrial fibrillation or atrial flutter."  *Id.* ¶¶ 12, 73, 202.  Pfizer also made donations to PANF to enable it to cover Sutent and Inlyta copays and encouraged patients to receive those drugs through PANF rather than Pfizer's "existing free drug program."  *Id.* ¶ 181 (quoting Pls.' Ex. C).  Advanced Care Scripts ("ACS"), a specialty pharmacy, facilitated these activities by—among other things—coordinating patient referrals to PANF.  *Id.* ¶¶ 8, 181.

In the plaintiffs' telling, this scheme allowed Pfizer to "raise its prices to supra-competitive levels."  *Id.* ¶¶ 4–5.  After all, "because . . . patients . . . were no longer incurring any cost" to purchase Pfizer's drugs, they had no incentive not to consume them.  *Id.* ¶ 30.  The upshot was that health insurers and the federal government paid "artificially increased prices" for Sutent, Inlyta, and Tikosyn and/or spent money on "an increased quantity of claims" for those drugs, *id.* ¶ 31, costing them "millions of dollars," *id.* ¶ 10.

The plaintiffs are not health insurers or the federal government, however.  Instead, they are Delaware LLCs created for litigation purposes.  According to the plaintiffs, some of the defendants' victims have assigned them the right to recover damages from the defendants' scheme.  *Id.* ¶¶ 2, 66, 69.  The plaintiffs list five "Representative Assignors" in their Amended Complaint and provide excerpts of their assignment agreements.  *Id.* at App'x.  They also purport to sue on behalf of other unnamed assignors.  *Id.* ¶¶ 1–3.

3

On May 20, 2022, the plaintiffs filed a complaint in this Court alleging claims under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68, and various state laws.  Compl. ¶¶ 167–373, Dkt. 1.  The Court dismissed the complaint for lack of standing, Dkt. 67, and the plaintiffs filed an amended complaint on May 8, 2023, Dkt. 77.  As before, the plaintiffs' complaint alleges claims under RICO and state law, *id.*, and the defendants move to dismiss for lack of standing and for failure to state a claim, Dkts. 82, 83, 84.  Pfizer and ACS additionally move to strike certain allegations in the complaint as improperly derived from a settlement agreement.  Dkts. 83, 84.

## II.   LEGAL STANDARDS

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a defendant may move to dismiss an action for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1).  Standing to sue is jurisdictional, meaning that if a litigant cannot demonstrate standing dismissal under Rule 12(b)(1) is proper.  *See, e.g.*, *Conf. of State Bank Supervisors v. OCC*, 313 F. Supp. 3d 285, 294 (D.D.C. 2018) (citing cases).  In deciding motions to dismiss under Rule 12(b)(1), the Court "may consider documents outside the pleadings." *Id.*

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss an action for failure to state a claim. Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim is facially plausible when the complaint contains 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Sanchez v. Office of State Superintendent of Educ.*, 45 F.4th 388, 395 (D.C. Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

### III.    ANALYSIS

For the following reasons, the Court concludes that it lacks jurisdiction over the plaintiffs' claims brought on behalf of the Amended Complaint's unnamed assignors and over all of the plaintiffs' state-law claims.  The Court has jurisdiction over the named or representative assignors' federal claims but will dismiss those claims under Rule 12(b)(6).

#### A.    Subject-Matter Jurisdiction

Whether the Court has subject-matter jurisdiction over the plaintiffs' claims turns on whether the plaintiffs have standing to sue.  As assignees of the entities whom the defendants allegedly injured, the plaintiffs have standing if (1) their assignors would have standing to sue and if (2) those assignors validly assigned their claims to the plaintiffs.  *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 274–75 (2008); *see, e.g.*, *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019).  The assignors have standing if they (1) suffered a concrete and tangible injury (2) caused by the defendants' challenged conduct (3) that a favorable judicial decision could redress.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

"Standing is not dispensed in gross."  *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)).  Rather, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  *Id.* (quoting *Davis*, 554 U.S. at 734).  When "a case is at the pleading stage, [a] plaintiff must 'clearly . . . allege facts demonstrating'" each element of standing for each claim on which he seeks relief.  *Spokeo*, 578 U.S. at 338 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)); *see also Lujan*, 504 U.S. at 561.

In some instances, the Court may resolve factual disputes as to a plaintiff's standing on a motion to dismiss under Rule 12(b)(1).  *See Cherokee Nation v. U.S. Dep't of Int.*, 643 F. Supp. 3d 90, 104 (D.D.C. 2022) (discussing the difference between "factual" and "facial" challenges to standing in this District).  It need not do so, however.  *Id.*; *see Haase v. Sessions*, 835 F.2d 902, 907 (D.C. Cir. 1987)*.*  Because the defendants in this case have not asked the Court to resolve any factual disputes in their favor, the Court will adjudicate the plaintiffs' standing based on the allegations in their complaint and the "undisputed facts evidenced in the record."  *Magruder v. Capital One, N.A.*, 540 F. Supp. 3d 1, 4 (D.D.C. 2021) (quoting *Herbert v. Nat'l Acad. of Scis.*, 874 F.2d 192, 197 (D.C. Cir. 1992)).

The plaintiffs assert standing to sue on behalf of five entities that they allege paid for Pfizer's drugs—SummaCare, Inc. ("Summacare"); Interamerican Medical Center Group, LLC ("Interamerican"); Preferred Medical Plan, Inc. ("Preferred"); Health First Health Plans, Inc. ("Health First"); and Centro de Pediatria y Medicina de Familia de Villalba, C.S.P. ("Centro")— as well as other unnamed assignors.  Amend. Compl. App'x.  The Court concludes that the plaintiffs lack standing to sue on behalf of the unnamed assignors.  It also concludes that they lack standing to pursue their state-law claims on behalf of the five entities named in the Amended Complaint (the "named assignors").  They do, however, have standing to pursue the named assignors' claims under federal law.

### 1.    Unnamed Assignors

The plaintiffs cannot sue on behalf of the unnamed assignors because their complaint pleads no facts establishing that those assignors, specifically, would have standing to sue on their own.  *See, e.g.*, *MSP Recovery Claims, LLC v. Actelion Pharm. US, Inc.*, No. 22-cv-07604, 2023 WL 5725517, at *8 (N.D. Cal. Sept. 5, 2023) ("At a minimum, Plaintiffs must plead some specific

6

facts alleging a specific named assignor assigned its claims to Plaintiffs via a valid assignment agreement."); *accord MAO-MSO Recovery II, LLC v. Mercury Gen.*, No. 21-56395, 2023 WL 1793469, at *2 (9th Cir. Feb. 7, 2023).  Although the operative complaint contends that the assignors it lists are representative of the unnamed assignors, Amend. Compl. ¶ 2 & nn.4–5, that is not enough.  Rather, "to establish standing," the plaintiffs must "name" or otherwise identify every entity whose claims they assert.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (discussing an analogous issue in the organizational-standing context).

### 2.   Named Assignors' State Law Claims

Similarly, the plaintiffs have not adequately alleged standing to pursue their state law claims on behalf of the named assignors.  Although the Amended Complaint alleges that the plaintiffs *collectively* possess claims under several states' consumer protection laws, it does not say which plaintiffs have been assigned which claims.  *See* Amend. Compl. ¶¶ 431–582.  A similar problem afflicts the Amended Complaint's discussion of the plaintiffs' claims for unjust enrichment under state common law and for violations of the Florida Civil Remedies for Criminal Practices Act.  *Id.* ¶¶ 583–620.  Accordingly, the Court cannot find that any specific plaintiff has standing to sue under the laws of any specific state.  Because the Court must dispense standing to specific plaintiffs and claims rather than groups of plaintiffs "in gross," it follows that the Amended Complaint does not adequately demonstrate that any plaintiff has standing to assert any given state-law claim.  *Davis*, 554 U.S. at 734; *see Summers*, 555 U.S. at 498–500.

### 3.   Named Assignors' Federal Claims

With respect to the named assignors' claims under the federal RICO statute, however, the plaintiffs have established standing.  Unlike the plaintiffs' first complaint, Dkt. 1, the Amended Complaint alleges facts demonstrating that each named assignor has suffered injuries in fact caused

by the defendants' challenged conduct and that this Court could redress.  *Lujan*, 504 U.S. at 560–61; *Spokeo*, 578 U.S. at 338.  It also shows that the named assignors have validly assigned their claims to the plaintiffs.  *Sprint*, 554 U.S. at 274–75.

*First*—and unlike the plaintiffs' first complaint in this action—the Amended Complaint alleges facts demonstrating that each named assignor has suffered a concrete injury.  The Amended Complaint contends that the defendants' misconduct "artificially inflated prices and quantities" of Sutent, Inlyta, and Tikosyn from 2009 through at least 2019.  Amend. Compl. ¶¶ 202, 308; *see, e.g.*, *id.* ¶ 184 (suggesting that payors continued to pay elevated prices for Sutent, Inlyta, and Tikosyn in 2019).  In turn, Exhibit A to the Amended Complaint suggests that Summacare, Interamerican, and Health First purchased each of Sutent, Inlyta, and Tikosyn during that ten-year period, and that Centro and Preferred purchased Sutent during parts of that period (in 2014–15 and 2019, respectively).[2]  Putting two and two together, Summacare, Interamerican, and Health First spent more on Sutent, Inlyta, and Tikosyn than they otherwise would have spent because of Pfizer's donations to PANF.  Centro and Preferred spent more on Sutent for the same reason.  Those "pocketbook injur[ies]" are "prototypical form[s] of injury in fact," *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021), giving Summacare, Interamerican, and Health First concrete injuries as to as to each drug and Centro and Preferred concrete injuries as to Sutent.

*Second*, the Amended Complaint adequately alleges causation and redressability.  Taking the allegations in the plaintiffs' Amended Complaint as true, the named assignors' pecuniary injuries are "fairly traceable" to the defendants' conduct.  Absent the defendants' conspiracy, each assignor would have paid less for Pfizer's drugs or paid for fewer of them.  *See Lexmark Int'l, Inc.*

---

[2] Because, based on Exhibit A, Centro and Preferred never purchased Inlyta or Tikosyn, it follows that they lack standing to sue for injuries arising out of purchases for either drug.

8

*v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014); *see also id.* ("Proximate causation is not a requirement of Article III standing."). And even a dollar in damages would help redress those injuries. *Sprint*, 554 U.S. at 286–87.

*Third*, and finally, the Amended Complaint adequately alleges that the named assignors assigned their claims to each plaintiff. According to the Amended Complaint, Summacare, Interamerican, Preferred, and Health First "irrevocably assigned . . . all [their] rights to recover against any liable third party . . . for payments made on behalf of [their] enrollees" to MSP Recovery LLC. Amend. Compl. App'x at 132–35. MSP Recovery LLC then reassigned Summacare's claims to a designated series of plaintiff MSP Recovery Claims, Series LLC; Interamerican's claims to plaintiff MSPA Claims I, LLC; Preferred's claims to plaintiff MAO-MSO Recovery II, LLC; and Health First's claims to a designated series of plaintiff MSP Recovery Claims Series 44, LLC. *Id.* For its part, Centro assigned "all its rights to recovery against any liable entity . . . for payments made on behalf of its [e]nrollees pursuant to its Government Healthcare Program" directly to "a designated series of [p]laintiff MSP Recovery Claims PROV, Series LLC." *Id.* at 136. Together with the text of the relevant assignment agreements, which the plaintiffs have provided to the Court, these allegations make it plausible that the named assignors assigned the claims at issue in this litigation to each of the plaintiffs. *See* Pls.' Resp. to PANF's Mot. to Dismiss Ex. A, Dkt. 87-1.

Although the plaintiffs' Amended Complaint and exhibits do not specifically show how much each named assignor paid for Sutent, Inlyta, and Tikosyn during each year of the (alleged) conspiracy, the plaintiffs need not do so to survive a motion to dismiss under Rule 12(b)(1). The plaintiffs describe Exhibit A of the Amended Complaint, also submitted separately to the Court as a Microsoft Excel spreadsheet, as "contain[ing] a year-by-year breakdown of claims paid by the

[named assignors]" from 2009 through 2021.  Amend. Compl. ¶ 2 n.5; *see id.* Ex. A.  Exhibit A contains one column, "msp_client," that appears to list each of the five named assignors by abbreviation; another column, "msp_drug_name," that lists one of Sutent, Inlyta, or Tikosyn; and another column, "msp_dos," listing dates by month, day, and year. *Id.* Ex. A.  Consistent with the Amended Complaint's description, the Court thus infers that Exhibit A shows the month, day, and year that each of the named assignors paid claims for Sutent, Inlyta, and Tikosyn.  So construed, Exhibit A demonstrates that each of the named assignors paid at least one claim for those drugs during the period of the (alleged) conspiracy, meaning each suffered an injury in fact. *Cf. MSP Recovery Claims, Series LLC v. Lundbeck LLC*, 664 F. Supp. 3d 635, 650 (E.D. Va. 2023) ("[T]he Court is not convinced that [the plaintiffs] must include specific documents or bills . . . at this stage in the proceeding.").

True also, and irrelevant also, the Amended Complaint does not say whether the named assignors' patients received copayment assistance from PANF.  The Amended Complaint alleges that PANF's payouts raised prices for *all* consumers of Pfizer's drugs, regardless of whether those consumers received copayment assistance from PANF.  Amend. Compl. ¶¶ 30, 37, 288–90.  In conjunction with Exhibit A, it also alleges that the named assignors paid for Pfizer's drugs during the period that PANF provided copayment assistance. *Id.* Ex. A.  As a result, it adequately pleads that the named assignors suffered injuries from the defendants' conduct.

Nor does it matter that, according to government records, Interamerican and Centro are physician practices rather than health insurance companies.  PANF's Mem. in Support of Mot. to Dismiss at 11, Dkt. 82-1.  That reality might make it unlikely that either Interamerican or Centro overpaid for any drugs from 2009 through 2021, but "[w]hether" the two organizations "actually" spent money on patients' drugs "is a question of fact" that the Court need not resolve on a motion

to dismiss. *MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*, No. 18-cv-2211, 2019 WL 1418129, at *10 (D.N.J. Mar. 29, 2019). In a similar vein, it is irrelevant that the applicable statutes of limitations might bar all assignors' claims arising out of payments made before 2016. PANF's Mem. in Support of Mot. to Dismiss at 12. "Statutes of limitations . . . create affirmative defenses" on the merits. *Gordon v. Nat'l Youth Work Alliance*, 675 F.2d 356, 360 (D.C. Cir. 1982); *W. Va. Highlands Conservancy v. Johnson*, 540 F. Supp. 2d 125, 138 (D.D.C. 2008) (quoting *Gordon*). They are "not a bar to jurisdiction" and do not limit a plaintiff's standing to sue. *Gordon*, 675 F.2d at 360; *W. Va. Highlands*, 540 F. Supp. 2d at 138.

It is also true that the Amended Complaint "does not include language specifying what 'claims' were assigned" by the named assignors to the plaintiffs. Pfizer's Mem. in Support of Mot. to Dismiss at 19, Dkt. 83-1. But the Amended Complaint does not stand alone—the plaintiffs have also provided (redacted) copies of the named assignors' assignment agreements with their briefing. Dkt. 87-1. The Court can consider those agreements in order to confirm its jurisdiction, *Conf. of State Bank Supervisors*, 313 F. Supp. 3d at 294, and the text of the agreements at least arguably covers the named assignors' claims arising under federal law. To the extent that ambiguity remains as to which claims the assignment agreement assigns, "the interpretation of ambiguous contract language" presents "question[s] of fact" that the Court need not resolve on a motion to dismiss under Rule 12(b)(1). *Flynn v. Dick Corp.*, 481 F.3d 824, 831 n.7 (D.C. Cir. 2007); *see Haase*, 835 F.2d at 907.[3]

_____

[3] For similar reasons, the Court need not decide at this juncture whether the plaintiffs have been assigned claims arising after the effective dates of the named assignors' assignment agreements, either because the named assignors' assignment agreements did not assign them or because MSP Recovery LLC did not assign them to the plaintiffs. *Cf.* PANF Mem. in Support of Mot. to Dismiss at 12. In view of the allegations in the Amended Complaint and the text of the applicable assignment agreements, many of which purport to allow for continuing assignment of the named assignors' claims, *see, e.g.*, Health First Recovery Agrmt. § 4.2, Summacare Recovery

Last but not least, three plaintiffs—MSP Recovery Claims, Series 44, and Claims PROV—seek relief for claims assigned to their designated series.  Courts have split on whether an LLC has standing to sue on behalf of a designated series in this manner.  *See MSP Recovery Claims, Series 44, LLC v. Quincy Mut. Fire Ins. Co.*, No. 22-cv-11271, 2023 WL 4107038, at *11 (D. Mass. June 21, 2023) (citing cases).  In this case, the Court concludes that all three plaintiffs may.  Recovery Claims and Claims PROV's operating agreements explicitly allow both LLCs to sue on their series' behalf, and the Certificate of Designation for Series 44's series says much the same thing.  MSP Recovery Claims, Series LLC Second Amend. & Restated LLC Op. Agmt. § 3.1(d) (Oct. 22, 2020), Dkt. 87-2; MSP Recovery Claims PROV, Series LLC LLC Op. Agmt. § 2.3 (Dec. 22, 2020), Dkt. 87-2; Series 44 Cert. of Designation at 2, Dkt. 87-1.  Because Delaware law "give[s] the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements," a Delaware court would likely honor this allocation of rights.  6 Del. Code § 18-1101(b); *R&R Capital, LLC v. Buck & Doe Run Valley Farms, LLC*, 2008 WL 3846318, at *4 (Del. Ch. 2008) (quoting 6 Del. Code § 18-1101(b)).  And because the question of whether an assignment to a series of a Delaware LLC also bestows rights upon the parent LLC is a question of Delaware law, it follows that each of MSP Recovery Claims, Series 44, and Claims PROV has standing to sue on behalf of the series to which claims were assigned.[4]

---

Agrmt. § 4.2, Dkt. 87-1, the Court cannot conclude based on the uncontested facts that no claims after the agreements' effective dates have been assigned.

[4] Delaware law also provides that an LLC's series "*may* have separate rights, powers, or duties" as its parent LLC.  6 Del. Code § 18-215 (emphasis added).  But "may" does not mean "must," meaning this provision does not preclude contrary provisions in LLC operating agreements.  *Accord MSP Recovery Claims, Series LLC v. ACE Am. Ins. Co.,* 974 F.3d 1305, 1319–20 (11th Cir. 2020) (citing 6 Del. Code § 18-215).

\*       \*       \*

For these reasons, Plaintiffs MSP Recovery Claims, MSPA Claims I, and Series 44 have standing to pursue their assignors' federal claims arising out of their purchases of Sutent, Tikosyn, and Inlyta.  Plaintiffs MAO-MSO and Recovery Claims PROV also have standing to pursue their federal claims arising out of their assignors' purchases of Sutent.  The Court will dismiss the plaintiffs' claims on behalf of the unnamed assignors, their claims under state law, and any claims by MAO-MSO or Recovery Claims PROV arising out of purchases of Tikosyn and Inlyta for lack of jurisdiction.

### B.       Failure to State a Claim

That leaves the plaintiffs' claims under the federal RICO statute, 18 U.S.C. §§ 1961–68. RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in . . . interstate commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity," *id.* § 1962(c), and for any person "to conspire to" engage in such activity, *id.* § 1962(d).  "Racketeering activity" includes (1) "any act or threat involving . . . bribery . . . which is chargeable under State law and punishable by imprisonment for more than one year" and (2) "any act which is indictable" under the federal Travel Act or the federal mail and wire fraud statutes.  *Id.* § 1961(1).  "Any person injured in his business or property by reason of" a RICO violation "may sue therefor" and receive treble damages.  *Id.* § 1964(c).

At the outset, the Amended Complaint's conclusory character makes it difficult for the Court to discern the factual allegations on which the plaintiffs' RICO claims rest.  The Amended Complaint is quite lengthy, containing more than 620 paragraphs spread across 139 pages.  Even

so, it rarely specifies the who, what, when, where, and how of the plaintiffs' theory—for example, *how* ACS allegedly conspired with Pfizer and PANF or *which* of Pfizer's payments to PANF amounted to acts of racketeering.  Further, certain allegations in the Amended Complaint relate to other lawsuits, making it challenging for the Court to ascertain which of the complaint's factual contentions bear on this case.  *See, e.g.*, Amend. Compl. ¶¶ 76, 394–95 (alleging misconduct with respect to Xenazine, a drug that Pfizer does not manufacture and that was at issue in *Lundbeck* but not this case).  This Court is not the first to alert the plaintiffs to this problem.  *See, e.g.*, *MSP Recovery Claims, Series LLC v. AIG Prop. Cas. Co.*, No. 20-cv-2102, 2021 WL 1164091, *1 (S.D.N.Y. Mar. 26, 2021) (dismissing an MSP complaint "long on invective and indignation but short on facts"); *MSP Recovery Claims, Series LLC v. N.Y. Cent. Mut. Fire Ins. Co.*, 2019 WL 4222654, *5 (N.D.N.Y. Sept. 5, 2019) (dismissing MSP action after observing: "[T]he Court is faced with a messy Complaint, improper exhibits, and [p]laintiffs' inconsistent arguments.").  "Federal courts do not possess infinite patience," *MSP-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 869, 878 (7th Cir. 2021), and while the Court has done its best to understand the plaintiffs' claims, it remains their burden to present "a short and plain statement of [their] claim[s] showing that [they are] entitled to relief," Fed. R. Civ. P. 8(a)(2).

Against that backdrop, and in view of the Court's understanding of the facts alleged in the Amended Complaint, the plaintiffs fail to state a claim under RICO's private right of action for two independent reasons.  First, under the indirect purchaser rule, the plaintiffs did not suffer injuries "by reason of" the defendants' RICO violations.  Second, the Amended Complaint does not plausibly allege a pattern of racketeering activity.  The Court will therefore dismiss the plaintiffs' RICO claims under Federal Rule of Civil Procedure 12(b)(6).

1.    Indirect Purchaser Rule

RICO affords a private right of action to persons "injured in [their] business or property by reason of" a RICO violation.  18 U.S.C. § 1964(c).  This language incorporates "common-law principles of proximate causation."  *Holmes v. SIPC*, 503 U.S. 258, 267 (1992).  It also mirrors § 4 of the Clayton Act, which authorizes suit by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws."  15 U.S.C. § 15(a); *see Holmes*, 503 U.S. at 267 (quoting 15 U.S.C. § 15(a)).

One principle of proximate causation, known to antitrust lawyers as the *Illinois Brick* or "indirect purchaser" rule, is particularly relevant here.  *See Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977); *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 (2019) (describing *Illinois Brick* as resting on "principles of proximate cause").  Under *Illinois Brick*, only "immediate buyers" from a lawbreaking seller may sue for injuries to their business or property.  *Pepper*, 139 S. Ct. at 1520 (quoting *Kansas v. UtiliCorp United Inc.*, 497 U.S. 199, 207 (1990)).  "[I]ndirect purchasers who are two or more steps removed from" the seller "may not sue."  *Id.* at 1521.  For example, if wrongdoer A sells to B, who sells to C, B but not C may sue A.  *Id.*  The idea is that B—not C—is the direct victim of A's misconduct, and that any injuries C suffers based on B's response to A's activity (say, its choice to pass along A's higher prices to C) are too attenuated to support liability. *Id.* at 1520–21; *cf. Hemi Group, LLC v. City of New York*, 559 U.S. 1, 10 (2010) ("[T]he general tendency of the law, in regard to damages at least, is not to go beyond the first step.") (quoting *Holmes*, 503 U.S. at 271–72).

The Supreme Court has recognized only two exceptions to *Illinois Brick*: an exception "when the direct purchaser and the indirect purchaser have entered into pre-existing cost-plus contracts," and an exception "when the direct purchaser is owned or controlled by the indirect

purchaser." *California v. ARC Am. Corp.*, 490 U.S. 93, 97 n.2 (1989). Expanding on the latter carveout, several circuits allow "an indirect purchaser [to] maintain a damage action upon a showing that there was a conspiracy between [a] manufacturer[] and [a] direct purchaser middleman." *In re Nifedipine Antitrust Litig.*, 335 F. Supp. 2d 6, 14 (D.D.C. 2004) (citing cases). This "co-conspirator exception" applies when a manufacturer and distributor make joint pricing and perhaps volume or other sales decisions at customer expense. *See, e.g.*, *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 751–52 (9th Cir. 2012) (citing cases); Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles & Their Application* ¶ 346h ("*Illinois Brick* does not limit suits by consumers against a manufacturer who illegally contracted with its dealers to set the latter's resale price . . . . This result has been phrased in terms of a 'co-conspirator' exception."). After all, in a co-conspirator case, a manufacturer harms its end-users in "one step"—by agreeing with its distributors to fix the prices they will pay or similar—albeit with the intermediary distributor's help. *Cf. Hemi Group*, 559 U.S. at 10.

Applied in this case, these principles raise three questions. Does the indirect-purchaser rule apply in civil RICO cases? If so, in view of the allegations in the Amended Complaint, do the plaintiffs' named assignors qualify as "direct" or as "indirect" purchasers? And if the named assignors count as "indirect" purchasers, can they still seek refuge under the co-conspirator exception? The Court will answer each question in the defendants' favor, meaning it must dismiss the plaintiffs' civil RICO claims for failure to state a claim.

*First*, the Court concludes that *Illinois Brick*'s indirect-purchaser rule applies in civil RICO cases. As a textual matter, RICO's private-right-of-action provision is almost identical to the Clayton Act provision that grounds *Illinois Brick*, suggesting that the two provisions should carry the same meaning. *Holmes*, 503 U.S. at 267–68; *see, e.g.*, *Northcross v. Bd. of Ed. of Memphis*

*City Schs.*, 412 U.S. 427, 428 (1973).  In addition, the indirect purchaser rule reflects principles of proximate causation that the Supreme Court has already said apply in the RICO context.  *Compare Pepper*, 139 S. Ct. at 1520 (explaining that the indirect purchaser rule reflects "principles of proximate cause"), *with Holmes*, 503 U.S. at 267–68 (applying principles of proximate cause developed in antitrust cases to RICO actions).  Consistent with all this, although the Supreme Court and D.C. Circuit have not opined on the point, "[e]very circuit to have considered the [issue] has held" that the indirect purchaser rule "applies to civil RICO actions."  *Humana, Inc. v. Biogen, Inc.*, 666 F. Supp. 3d 135, 141 (D. Mass. 2023).

*Second*, the Amended Complaint does not plausibly allege that the named assignors count as direct rather than indirect purchasers.  According to the Amended Complaint, the defendants' conspiracy boosted demand for Sutent, Tikosyn, and Inlyta, allowing Pfizer to sell more of those drugs and/or to charge higher prices for them.  Amend. Compl. ¶¶ 30–31.  But the Amended Complaint does not allege that any of the named assignors purchased anything from Pfizer.  Instead, it says that they made payments to "dispensing pharmacies," including but not limited to defendant ACS.  *Id.* ¶ 222; *see, e.g.*, *id.* ¶¶ 20 & n.8, 203, 240, 263.  A report attached to the Amended Complaint clarifies that drug manufacturers "typically sell their prescription medications to wholesale distributors, which in turn sell products to pharmacies, hospitals, doctors, and other entities that deliver medications to patients."  House Cmte. on Oversight & Reform, *Drug Pricing Investigation Majority Staff Report* 8–9 & Fig. 1 (Dec. 10, 2021), Dkt. 79.[5]  That paints a "textbook indirect-purchaser" picture, as the Third Circuit has recognized: Pfizer sold to distributors, who sold to pharmacies, who sold to doctors and patients, who triggered the named

---

[5] "In determining whether a complaint fails to state a claim" under Rule 12(b)(6), the Court "may consider . . . documents either attached to or incorporated in the complaint," including the House Report.  *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

assignors' payments back to the pharmacies. *Humana, Inc. v. Indivior, Inc.*, Nos. 21-2573 & 21-2574, 2022 WL 17718342, at *3 (3d Cir. Dec. 15, 2022); *accord United Healthcare Servs., Inc. v. United Therapeutics Corp.*, No. 22-2948, 2024 WL 1256266, at *6–8 (D. Md. Mar. 25, 2024); *Lundbeck*, 664 F. Supp. 3d at 651–52; *Sanofi Adventis*, 2019 WL 1418129, at *14–16.

*Third*, any co-conspirator exception to *Illinois Brick* would not help the plaintiffs.[6]  The plaintiffs allege that the named assignors sometimes paid ACS for Pfizer's drugs and that ACS participated in Pfizer and PANF's racketeering enterprise.[7]  Amend. Compl. ¶¶ 9, 15–16, 222. Even so, they do not allege that ACS made pricing, volume, or other equivalent sales decisions with Pfizer and PANF, as any co-conspirator exception would require.  Rather, ACS sits *behind* Pfizer in the plaintiffs' casual chain: ACS facilitated Pfizer's donations to PANF, which boosted demand for Pfizer's drugs, which altered Pfizer's volume and pricing decisions, which filtered through Pfizer's wholesalers to pharmacies (including ACS again) to the named assignors.  That places ACS's alleged misconduct many steps away from the plaintiffs' injuries, making clear that the named assignors count as indirect purchasers and that this case is not a co-conspirator case. Putting the point differently, the co-conspirator exception applies when a co-conspirator functions as a "seller," but ACS's (alleged) conspiratorial conduct had little to do with its sales.  *See Marion Healthcare, LLC v. Becton Dickson & Co.*, 952 F.3d 832, 839 (7th Cir. 2020).

---

[6] The Court assumes without deciding (1) that *Illinois Brick* allows for a co-conspirator exception and (2) that such an exception would also apply in the RICO context. *Cf. In re Nifedipine*, 335 F. Supp. 2d at 14.  It also assumes without deciding (3) that a RICO co-conspirator exception would cover more than vertical price-fixing conspiracies. *But cf. Dickson v. Microsoft Corp.*, 309 F.3d 193, 215 (4th Cir. 2002).

[7] In addition, any co-conspirator exception would not protect payments made by the named assignors to pharmacies *besides* ACS—or, to be precise, an unlabeled spreadsheet following the plaintiffs' exhibit JJ—which the plaintiffs represent records payments that their assignors made to ACS, it appears that ACS may have received comparably few payments from the named assignors. *See* Amend. Compl. ¶ 20 n.8; Dkt. 79 at 1111–18.

The plaintiffs reply that the indirect-purchaser rule "should not be applied to RICO," emphasizing that the Supreme Court has employed a "flexible proximate cause analysis" in RICO cases instead.  Pls.' Mem. in Opp. to Defs.' Mot. to Dismiss at 15–16, Dkt. 87.  None of the cases that the plaintiffs cite for that proposition, however, suggests that the Supreme Court's proximate cause analysis in RICO cases would supplant *Illinois Brick*.  *See Holmes*, 503 U.S. at 264–76; *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 456–62 (2006); *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654–55 (2008).  Indeed, those opinions' emphasis on the textual and contextual similarities between RICO and the Clayton Act suggests the opposite, especially because *Illinois Brick* and other proximate cause doctrines coexist in the antitrust context.  *Holmes*, 503 U.S. at 263; *Ideal Steel*, 547 U.S. at 456–57; *see, e.g.*, *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535–41 (1983).  Nor does 18 U.S.C. § 1962(c), which imposes liability on all who participate "directly or indirectly" in a racketeering enterprise, distinguish RICO from the Clayton Act as a textual matter.  The indirect-purchaser rule offers a gloss on 18 U.S.C. § 1964(c), which governs *who may sue* for damages under RICO.  By contrast, § 1962(c) sets out the substantive conditions of RICO liability.

In the alternative, the plaintiffs emphasize that the injuries they suffered are not "derived from" another "third party's direct injury."  Pls.' Mem. in Opp. to Def.'s Mot. to Dismiss at 14.  But if the defendants' conspiracy allowed Pfizer to boost prices for its drugs, Pfizer's distributors paid those increased prices first and suffered injury as a result.  *Illinois Brick*, 431 U.S. at 728–29.  More importantly, the indirect-purchaser rule is not a no-more-direct-injury rule.  Rather, the rule supplants inquiry into who within a value chain has suffered a direct injury first—that is, into whether a seller's illegal overcharges injured direct purchasers, downstream consumers, or both.  *Pepper*, 139 S. Ct. at 1521.

Finally, the plaintiffs lean heavily on the co-conspirator exception, emphasizing that the named assignors sometimes "purchased" drugs "directly from . . . ACS." Pls.' Mem. in Opp. to Defs.' Mot. to Dismiss at 8. This observation does not help the plaintiffs with respect to the drugs their named assignors did *not* purchase from ACS, however. More importantly—and in any event—ACS did not participate in any conspiracy by altering the terms of its sales to the named assignors. Indeed, the reality that any such alterations were independent from Pfizer and PANF makes the relationship between ACS and the named assignors' injuries too attenuated to support application of the co-conspirator exception to the indirect purchaser rule. None of the plaintiffs' cases says otherwise. Each involves conspiracies between manufacturers and distributors in which both agreed on the prices the distributors would charge, the volumes the distributors would sell, or other equivalent contract terms. *See, e.g.*, *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 340–42 (7th Cir. 2022) (prices and contract terms); *In re Nat'l Football League Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1157–58 (9th Cir. 2019) (volumes). In those cases, unlike this one, the distributors' conduct bore directly on end consumers and thus made co-conspirator liability appropriate.[8]

In a last-ditch effort to avoid the indirect-purchaser rule, the plaintiffs urge this Court to expand the co-conspirator exception further. The Court will not. The Supreme Court has warned lower courts against "litigat[ing] a series of exceptions" to *Illinois Brick*, a warning this Court must heed. *UtiliCorp*, 497 U.S. at 217.

---

[8] The plaintiffs' observation that RICO liability is joint and several, so that they could recover 100% of their damages under RICO from ACS if they prevailed against it, does not help them either. The indirect-purchaser rule governs whether the plaintiffs have a cause of action based on an injury to their "business or property by reason of" ACS's conduct. 18 U.S.C. § 1964(c). Without a cause of action the plaintiffs may not recover damages from anyone regardless of whether liability under RICO is joint and several.

For these reasons, the indirect-purchaser rule bars the plaintiffs' RICO claims.

> 2.     Racketeering Activity

The plaintiffs' RICO claims also fail for another, independent reason: the Amended Complaint does not plausibly allege a pattern of racketeering activity.

Under 18 U.S.C. § 1962(c), it is "unlawful for any person . . . associated with any enterprise engaged in . . . interstate or foreign commerce . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(d) makes it unlawful "to conspire to violate" § 1962(c). Liability under both sections requires "a pattern of racketeering activity" (under § 1962(c)) or a conspiracy to engage in a pattern of racketeering activity (under § 1962(d)). *See, e.g.*, *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).

"[R]acketeering activity" includes "any act 'chargeable' under several generically described state criminal laws" and "any act 'indictable' under numerous federal criminal provisions." *Id.* at 481 (quoting 18 U.S.C. § 1961(1)). The plaintiffs allege three types of racketeering activity: violations of state "bribery" statutes, violations of the federal Travel Act, and violations of the federal wire and mail fraud statutes. Amend. Compl. ¶¶ 371, 372, 375. Because the Amended Complaint does not plausibly allege any of those violations, however, the Court will dismiss the plaintiffs' RICO claims for failure to state a claim.

***State bribery statutes.*** "As used in" RICO, "racketeering activity" includes "any act or threat involving . . . bribery . . . which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1). To involve bribery, an act "must be capable of being generically classified" as a bribe. *See Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 409–10 (2003).

A person commits generic bribery when "he solicits, accepts, or agrees to accept any benefit as consideration for knowingly violating or agreeing to violate a duty of fidelity," either as a public servant or as a private individual holding certain positions of trust.[9]  Am. L. Inst., Model Penal Code § 224.8 (1980) (commercial bribery); *see id.* § 240.1 (bribery of a public official); *In re EpiPen Direct Purchaser Litig.*, No. 20-cv-827, 2022 WL 1017770, at *4–5 (D. Minn. Apr. 5, 2022) ("[G]eneric bribery" requires "'relations which are recognized in a society as involving special trust.'") (quoting *Perrin v. United States*, 444 U.S. 37, 45 n.11 (1979)).  This duty-of-fidelity requirement is significant, as it separates bribery from other offenses involving improper payments.  For example, a smuggler who pays a border guard to ignore his smuggling bribes the border guard, for his payment pays the guard to breach his duties to his employer.  But a smuggler who pays a drug courier to carry drugs across the border does not bribe the courier, as the courier's decision to smuggle does not implicate any duty of fidelity.

---

[9] The parties dispute whether RICO's "any act or threat involving [a predicate offense]" language requires a "conduct based" approach to RICO predicates—in which the Court considers whether a defendant's alleged conduct (1) involved a generic predicate offense and (2) was chargeable under State law and punishable by more than a year's imprisonment—or a "categorical" approach—in which the Court considers whether a defendant's conduct was chargeable under a State law whose elements necessarily encompass the elements of the generic offense.  *Cf. Taylor v. United States*, 495 U.S. 575, 600–01 (1990).  Every Circuit to consider the question has held that RICO prescribes a conduct-based approach rather than a categorical approach, and the Court would be inclined to agree.  *Johnson v. United States*, 64 F.4th 715, 728 (6th Cir. 2023); *United States v. Brown*, 973 F.3d 667, 709 (7th Cir. 2020).

The Court need not decide whether § 1961(1)(A) is conduct-based or categorical, however, as the plaintiffs fail to state a claim regardless of the path the Court takes.  If § 1961(1)(A) is conduct-based, the plaintiffs fail to state a claim because they do not plausibly allege that the defendants engaged in generic bribery.  And if § 1961(1)(A) is categorical, the plaintiffs fail to state a claim because they do not allege violations of state statutes that categorically encompass generic bribery—because the plaintiffs do not plausibly allege conduct amounting to generic bribery, any statute that the plaintiffs plausibly violated could not categorically encompass the elements of generic bribery.

Generic bribery's duty-of-fidelity requirement dooms the bribery allegations in the plaintiffs' Amended Complaint.  The Amended Complaint posits that Pfizer made or conspired to make payments to PANF to induce it "to refer patients for receipt of" Pfizer's drugs.  Amend. Compl. ¶ 377; *see, e.g.*, *id.* ¶¶ 379–90.  It does not, however, plead facts suggesting that PANF owed a duty of fidelity to anyone to abstain from those referrals.  Duties of fidelity require "a special relationship of trust or confidence," a relationship that charities do not typically hold with their beneficiaries and that PANF did not seem to hold with anyone.  *Krukas v. AARP, Inc.*, 458 F. Supp. 3d 1, 9 (D.D.C. 2020) (holding that AARP lacked a fiduciary duty to its members); *cf. EpiPen*, 2022 WL 1017770, at *3–5.

The plaintiffs' contrary authorities do not say otherwise.  It is true that, in some cases, "arrangements involving 'kickbacks'" under state law and/or violations of the Federal Anti-Kickback Statute can "constitute 'bribery.'"  *United States v. Gross*, 370 F. Supp. 3d 1139, 1150 (C.D. Cal. 2019).  Those cases, however, involve "illegal monetary incentives meant to induce a person, often a doctor, to use his or her *position of trust* to influence another, often the patient, for the purpose of financially benefitting a third party."  *Id.* (emphasis added); *see, e.g.*, *United States ex rel. Travis v. Gilead Scis., Inc.*, 596 F. Supp. 3d 522, 538 (E.D. Pa. 2022) (describing scheme "to funnel money to" doctors); *United States v. Rogers*, 389 F. Supp. 3d 774, 793 (C.D. Cal. 2019) (kickback scheme directed at doctor).  Here, by contrast, the plaintiffs do not adequately allege that PANF occupied an equivalent position of trust.  *United States v. Babaria* does not change this conclusion; *Barbaria* deals with the position-of-trust enhancement contained in the Sentencing Guidelines, which sweeps more broadly than the duty-of-fidelity requirement for bribery.  775 F.3d 593, 596–97 (3d Cir. 2015); *cf. United States v. Adam*, 70 F.3d 776, 482 (4th Cir. 1995); *United States v. Liss*, 265 F.3d 1220, 1229 (11th Cir. 2001) (similar).

Nor does *Perrin v. United States* get the plaintiffs to the finish line.  444 U.S. 37 (1979).  *Perrin* interprets the Travel Act, a federal precursor to RICO in which Congress similarly included a list of predicates incorporating State offenses.  The case holds that generic bribery under the Travel Act includes "bribery of private persons."  *Id.* at 48.  *Perrin* does not hold that *any* payment to a private person counts as bribery, however, and it approvingly cites the Model Penal Code's decision to link bribery with "relations . . . involving special trust."  *Id.* at 45 n.11.[10]  As a result, *Perrin* does not suggest that generic bribery under RICO requires anything less than a breach of a duty of fidelity.

For these reasons, the Amended Complaint does not plausibly allege that the defendants committed or conspired to commit "act[s] of bribery . . . chargeable under State law and punishable by imprisonment for more than one year."  18 U.S.C. § 1961(1)(A).

***Travel Act.***  RICO also says that violations of the federal Travel Act, 18 U.S.C. § 1952, count as racketeering acts or predicates.  The Travel Act makes it illegal to "perform[] or attempt[] to perform" certain specified "unlawful activit[ies]" after "travel[ing] in interstate or foreign commerce or us[ing] the mail or any facility in interstate commerce, with intent to . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment or carrying on" of those activities.  *Id.* § 1952(a)(3).

Unlawful activities include "bribery . . . in violation of the laws of the State in which committed or of the United States."  *Id.* § 1952(b)(2).  Bribery under the Travel Act means generic bribery.  *Perrin*, 444 U.S. at 45.

---

[10]  The plaintiffs observe—correctly—that "[t]he assertion that *all* special trust relationships should be free from bribery is not equivalent to the assertion that *only* special trust relationships should be free from bribery."  Pls.' Opp. to Defs.' Mot. to Dismiss at 11 n.18, Dkt. 86.  In context, however, the language quoted in *Perrin* implies that bribery offenses must involve relations of special trust in some way.

The Amended Complaint does not plausibly allege generic bribery for the reasons given above.  Generic bribery requires payments meant to induce breaches of a duty of fidelity, and PANF is not alleged to have borne any such duties.  As a result, the Amended Complaint does not plausibly allege that the defendants violated or conspired to violate the Travel Act.

**_Wire and mail fraud._**  Finally, RICO makes violations of the federal mail and wire fraud statutes acts of racketeering.  *See* 18 U.S.C. §§ 1341, 1343.  The mail fraud statute targets those who use the mails "for the purpose of executing" a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses."  *Id.* § 1341.  The wire fraud statute similarly criminalizes the use of "wire, radio, or television communication[s]" as part of a fraudulent scheme.  *Id.* § 1343.

Both statutes require "specific intent to defraud"—*e.g.*, that a fraudster make statements he knows to be false or misleading.  *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1118 (D.C. Cir. 2009) (per curiam).  In pleading fraud, including under RICO, a plaintiff must satisfy "the heightened pleading standards of Federal Rule of Civil Procedure 9(b)."  *Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*, 406 F. Supp. 3d 72, 78 (D.D.C. 2019).   "Relevant circumstances of mail and wire fraud subject to this heightened standard include 'the time, place, and contents of [any] false representations.'"  *Id.* (quoting *Johnson v. Comput. Tech. Servs., Inc.*, 670 F. Supp. 1036, 1039–40 (D.D.C. 1987)).  A defendant's knowledge of falsity, however, "may be alleged generally."  Fed. R. Civ. P. 9(b).

The Amended Complaint does not plausibly allege fraud within the contours of Rule 9(b).  To the extent that it states "the time, place, and contents" of the defendants' alleged misrepresentations, it pleads no facts suggesting that the defendants knew those representations were false when they made them.  In particular, the Amended Complaint says that, when Pfizer

and ACS enrolled in the Medicare program and when they submitted bills for payment to Medicare contractors, they falsely certified their compliance with "state [and] federal bribery [and] anti-kickback statute[s]." Amend. Compl. ¶ 19; *see, e.g.*, *id.* ¶¶ 20, 83, 91. But it pleads no facts so much as hinting that either Pfizer or ACS thought that their collaboration with PANF violated the law at those times. Indeed, much of the Amended Complaint suggests the opposite. According to Exhibit AA to the Amended Complaint, Pfizer sued in 2020 to vindicate its position that it could lawfully donate to entities like PANF. Dkt. 79 at 526–52. And according to the Amended Complaint itself, the defendants operated under several advisory opinions from the U.S. Department of Health and Human Services confirming that their conduct was lawful. Amend. Compl. ¶¶ 124, 132, 153. That does not look like intentional fraud.

Meanwhile, although the Amended Complaint says that the defendants lied to the Department to obtain its advisory opinions, it does not identify the "content" of those lies and thus fails to plead fraud with particularity. *Ambellu*, 406 F. Supp. 3d at 78; *see* Amend. Compl. ¶¶ 123–24, 153. To obtain its first advisory opinion in 2005, PANF certified (among other things) that "[n]o drug manufacturer or donor exer[ted] any direct or indirect influence over" it, that it acted "in a truly independent manner," that it "provide[d] assistance based on a reasonable, verifiable, and uniform measure of financial need," and that it did not provide data to drug manufacturers "that would allow the manufacturer to substantiate the amount of its donations with the number of subsidized prescriptions for its products." Amend. Compl. ¶ 116. To obtain subsequent advisory opinions, it sang a similar tune. *See, e.g.*, *id.* ¶¶ 150–54. Although the plaintiffs allege generally that those certifications were false, they do not explain *which* ones were false or why.[11] *See, e.g.*,

---

[11] In addition, the Amended Complaint alleges that the defendants' unlawful scheme began in 2009. Amend. Compl. ¶ 202. If that is true, it is far from obvious how PANF could have made knowingly false statements to the Department about the scheme in 2005, before that date.

*id.* ¶ 124 ("To obtain [its] favorable Advisory Opinion, PANF falsely certified that it was, and will, adhere to [the Department's] requirements."); *id.* ¶ 154 (alleging that PANF "misled" the Department by certifying "that it was complying with" these requirements). As a result, they fall short of what Rule 9(b) requires. *Cf. Ambellu*, 406 F. Supp. 3d at 78; *Sandza v. Barclays Bank PLC*, 151 F. Supp. 3d 94, 109 (D.D.C. 2015) (dismissing RICO fraud claims for failure to state a claim when plaintiff's "description of the basic content of [the defendant's] alleged fraud [was] frustratingly opaque"); *Humana*, 666 F. Supp. 3d at 155–60.

Although the Amended Complaint pleads that the defendants knew that some of their statements were false, *see, e.g.*, *id.* ¶¶ 17, 60, 294, that is not enough. Without "some facts to support" claims of knowledge, the complaint "'stops short of the line between possibility and plausibility of entitlement to relief.'" *Ambellu*, 406 F. Supp. 3d at 80 (quoting *Ashcroft*, 556 U.S. at 678). For similar reasons, it does not matter that fraudulent intent is typically a question of fact that can be inferred from surrounding circumstances or from a defendant's *modus operandi*. *Philip Morris*, 566 F.3d at 1118; *United States v. Sum of $70,990,605*, 4 F. Supp. 3d 189, 202 (D.D.C. 2014). Even granting the premise, the Amended Complaint does not plead enough facts to suggest that the defendants possessed an intent to defraud.

More promisingly, the Amended Complaint does allege that PANF provided Pfizer with data and "information . . . to enable it to conduct ROI calculations." Amend. Compl. ¶¶ 17. Connecting the dots, that evidence might suggest that PANF could not have truthfully told the Department that it did not provide drug data to Pfizer that allowed it "to substantiate the amount of its donations with the number of subsidized prescriptions for its products." *Id.* ¶ 116. But that theory faces several problems, even assuming that the Amended Complaint pleads a degree of coordination with adequate clarity. For one, the Amended Complaint does not support the

27

assumption that the "ROI calculations" Pfizer conducted "substantiated the amount of [Pfizer's] donations with the number of subsidized prescriptions for its products." *Id.* ¶¶ 17, 116.  For another, it does not say whether PANF provided Pfizer its data in a manner that undermined its earlier representations to the Department.

The plaintiffs' remaining arguments fare no better.  The Amended Complaint alleges that by 2016 Pfizer knew that PANF used Pfizer's money to cover copayments for Pfizer's drugs and that it "used [PANF] as a conduit."  Amend. Compl. ¶¶ 181–82.  But the plaintiffs fail to explain why that knowledge rendered specific representations by Pfizer false or fraudulent.  The Amended Complaint also alleges that, as part of a settlement between PANF and the Department, the Department agreed that it would not "rescind or terminate" one of PANF's advisory opinions—an action the Department could take "only where relevant and material facts were not fully, completely, and accurately disclosed to" it.  *Id.* ¶ 191 & n.49; 42 C.F.R. § 1008.45(a)(1).  But it does not allege that the Department ever seriously contemplated recission, much less that it ever would have had a factual basis for doing so.

*       *       *

For these two, independent reasons—the named assignors' status as indirect purchasers and the Amended Complaint's failure to plausibly allege acts of racketeering activity—the Court will dismiss the plaintiffs' RICO claims for failure to state a claim.  In doing so, the Court joins at least three other district courts that have dismissed similar claims by MSP plaintiffs under Federal Rule of Civil Procedure 12(b)(6).  *See Lundbeck*, 664 F. Supp. 3d at 651–52, 657–58; *United Therapeutics*, 2024 WL 1256266, at *5–8; *MSP Recovery Claims, Series LLC v. Caring Voice Coal., Inc.*, No. 21-21317, 2022 WL 3155035, at *9–12 (S.D. Fla. July 21, 2022), *report & recommendation adopted*, 2022 WL 4448256 (S.D. Fla. Sept. 23, 2022).

Because the Court will dismiss the plaintiffs' Amended Complaint for the reasons outlined above, it need not consider the defendants' remaining arguments for dismissing the plaintiffs' RICO claims, including their argument that the applicable statutes of limitations bar them.  It will also deny the defendants' motion to strike certain allegations from the plaintiffs' Amended Complaint as moot.

Finally, the Court will defer ruling on whether the plaintiffs may file a third Amended Complaint.  The Court recognizes that it did not reach the merits of the plaintiffs' claims in its prior opinion granting the defendants' motions to dismiss, *see* Dkt. 67, and that the plaintiffs could cure some of the deficiencies outlined in this opinion, *see, e.g.*, *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (per curiam) ("[L]eave to amend is almost always allowed to cure deficiencies in pleading fraud.") (cleaned up).   Still, "this is far from [the plaintiffs'] first rodeo." *AIG Prop. Cas. Co.*, 2021 WL 1164091, at *15 (denying leave to amend).  The plaintiffs have "brought many of these cases across the country" and have "already amended [their] complaint against these [d]efendants once."   *Id.*   In addition, the defendants' voluminous memoranda in support of their first round of motions to dismiss gave "notice from the outset" that the issues considered in this opinion—including the indirect purchaser rule and the circumstances surrounding the defendants' alleged bribery and fraud—"would be front and center" in future litigation.  *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 935 F.3d 573, 582 (7th Cir. 2019) (affirming denial of leave to amend).  The Court is thus skeptical that the plaintiffs can overcome the pleading deficiencies identified here and by multiple other courts.  Should the plaintiffs seek leave to amend their complaint for a *third* time, the Court will carefully scrutinize whether any such attempt would be futile, *see* Fed. R. Civ. P. 15(a).

## CONCLUSION

For these reasons, the Court will dismiss the plaintiffs' claims under state law and on behalf of their unnamed assignors for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1). It will dismiss the plaintiffs' RICO claims for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and will deny the defendants' motions to strike as moot.  A separate order accompanies this memorandum opinion.

March 30, 2024

DABNEY L. FRIEDRICH
United States District Judge